Wharton v. Lavender.

ROBERT H. WHARTON, Administrator, v. JULIA A. LAVENDER, et al.

AND

WM. WATSON et al. v. ROBT. H. WHARTON et al.

1. SUPREME COURT PRACTICE. *Appeal. Exceptions.* An appeal from the rulings of the chancellor upon certain exceptions to the master's report will not bring up the case as to unconnected exceptions of other parties.

2. ADMINISTRATION. *Appropriation of fund. When complete.* L. borrowed money from a Wilson county national bank to buy back certain specified cattle, giving his note therefor, with W. as surety, and at thirty days, and agreeing with the bank in parol that the cattle should be pledged for the debt, sold by him within thirty days, the proceeds to be applied to the satisfaction of the debt. He sold the cattle within thirty days for the declared purpose of paying the debt, and directed the purchaser at the time, according to weight of testimony, to pay the purchase money, when the cattle were delivered to him at Nashville, to W. on the debt, if present, and if not, to deposit the money in a Nashville bank for the benefit of the Wilson county bank on the debt, and the purchaser, in violation of the instructions, sent a check by the driver of the cattle, payable to L., which check was delivered to L.'s wife, L. being on his death bed, and dying within forty-eight hours thereafter, it not being shown that he received the check or took any action in relation thereto: *Held,* that there was a completed appropriation of the fund by L. in his lifetime, which was not affected by his death and the insolvency of his estate.

FROM WILSON.

Appeal from the Chancery Court at Lebanon. GEO. E. SEAY, Ch.

B. J. TARVER for complainant.

ANDREW B. MARTIN for defendant.

COOPER, J., delivered the opinion of the court.

Bills filed to wind up the insolvent estate of Geo. W. Lavender, deceased, of which Robert H. Wharton is the administrator. The causes were consolidated and heard together, the decree on the hearing making a reference to the master to take and state an account with the administrator. To the report of the master, made in compliance with the order of reference, the administrator filed two exceptions. The chancellor overruled these exceptions, and confirmed the report. From this decree, "in so far as it overruled the exceptions of defendant, Wharton, to the master's report, and confirms the same," Wharton appealed. The Referees have reported that the chancellor's decree should be affirmed. Wharton excepts.

The creditors of the estate also filed exceptions in the court below to the master's report, which were overruled by the chancellor. The Referees have considered these exceptions, and reported in favor of affirming the action of the chancellor. The creditors have filed exceptions to the report of the Referees on these points. But the creditors did not appeal from the decree below, and the appeal of Wharton is special, not general. Such an appeal only operates to bring up for revision so much of the decree as is appealed from: *Wood* v. *Cooper*, 2 Heis., 441. And even a general appeal by one party does not necessarily bring up the exceptions of the opposite party to particular and severable items of the master's report. To have this effect the exceptions of the appellee must be so connected with the subject

matter of the exceptions of the appellant as to re-quire action upon them to do complete justice, or must go to the principles of the decree on which the report is based. Neither of these conditions exist in this case. The exceptions of the creditors to the report of the Referees must, therefore, be disallowed.

One of the appellant's exceptions only goes to the amount of an item of charge found against him by the master. We concur with the master, the chancellor and the Referees in the conclusion that this exception is not well taken.

The other exception is to a charge against the appellant, as administrator, of $710, the proceeds of a check on a Nashville bank, drawn by one John Embry, payable to the order of the intestate, George W. Lavender, and found among his papers after his death. This check was applied by the appellant to the payment of a particular debt of the intestate to the Second National Bank of Lebanon, due by note, on which the appellant was liable as surety. The contention of the appellant is that the bank had acquired, in the lifetime of the intestate, under a contract with him, such a right to or lien on the fund evidenced by the check as would entitle it to the fund in preference to other creditors, notwithstanding the insolvency of the estate. This contention is made in the appellant, Wharton's, answer to the bill of the creditors, as will be seen presently, and is also distinctly raised by his exception to the master's report. That exception is, that the master should not have charged him with the $710, because the proceeds

of cattle pledged to pay a bank debt, Lavender being the agent of the bank to sell the stock and pay over to the bank, and then adds: "He did sell, and directed the purchaser to pay over the fund to Wharton, who was security on the debt, or to the bank.

The facts are peculiar. In February, 1876, the intestate sold certain cattle which he had bought with money obtained from the Second National Bank of Lebanon, to two Kentuckians. One of these purchasers, with whom the trade was made, paid the purchase price at the time to the intestate, who immediately used the money in paying his note to the bank. Two days afterwards the other purchaser, upon seeing the cattle, expressed dissatisfaction, and proposed to give the intestate $25 if he would cancel the trade and take the stock back. The intestate was willing to accept the offer if he could make some arrangement with the bank to obtain the money. The bank did let him have $700 upon his note, dated February 14, 1876, at one month, which was also signed a few days afterwards by appellant as a co-maker. The cattle bought back with this money were afterwards, about the latter part of the same month, sold by the intestate to J. B. Embry for $710. The sale was made at the house of the intestate in Wilson county, the intestate being then sick in bed of the disease of which he died a few days thereafter, on March 2nd. The cattle were sent to Nashville by the intestate's brother, and delivered to Embry, who drew a check on a bank for the price in favor of the intestate, and sent it to him by his brother. The con-

dition of the intestate when the check was brought to him is not shown. It only appears that he died a day or two thereafter, and that the appellant received the check from the intestate's wife, and used it on March 6, 1876, in paying the note to the bank. The appellant became administrator about the first of April thereafter.

The creditors, who are the complainants in one of the bills in this cause, aver in their bill that the defendant, Wharton, received as administrator a check in favor of the intestate for $710, and ought to be charged therewith. Wharton, in his answer, after stating the sale of the cattle as above, and the offer to cancel the trade, says: "The bank agreed to take the title to the cattle, the intestate to hold them and sell to some one else, and turn over the money or proceeds to the Second National Bank, on its debt. This proposition was accepted by both the intestate and the said bank, and under it the said bank was the owner of the cattle, and the intestate had only the power to sell and apply the proceeds to his said debt. Soon after this arrangement was made the intestate sold the said cattle to one John Embry, and directed him to pay the money over to the benefit of the Second National Bank in payment of his said debt. The said Embry did pay the said fund, $710, proceeds of said cattle, according to his agreement with the intestate, and did so after the death of the latter."

The President of the Second National Bank, in his deposition, after stating that the bank had ad-

vanced to the intestate, upon his note with Wharton as endorser, the money used in buying the particular cattle, and that this note was paid with the proceeds of the first sale, says: "He (Lavender) came to me after the sale, and asked me if I would let him have the money to buy the cattle back. I told him I would do so on condition that he would not keep the cattle longer than thirty days, and that he would pledge the cattle for the payment of the note again, and on the strength of this we loaned him the money. The note herewith filed is the note taken by the bank from Lavender and Wharton for this second and last loan. Under the pledge of the stock and the contract, Lavender was to hold the stock and sell the same, and apply the proceeds to the payment of the note. The note was paid off by R. H. Wharton, that is, he brought the check to the bank that paid off the note." The receipt on the back of the note shows that it was paid March 6, 1876, by R. H. Wharton, administrator of George W. Lavender. The witness, upon cross-examination, says: "After the note was executed I regarded the cattle as bound for the payment of the note, not the cattle themselves, but the proceeds. It was like any other property pledged to pay a debt."

Embry, the purchaser, testifies that Lavender told him that his object in selling the cattle was to pay a debt he owed the Second National Bank at Lebanon, and adds: "The cattle were to be delivered to me at Nashville, and I was to pay for them on delivery. He told me I could either place the money

in some bank in Nashville to his credit, to be sent to the Second National Bank to be entered to his credit, or I could pay R. H. Wharton for him, or give the check to his (Lavender's) brother. I don't know that he used the word check, but said pay his brother. The cattle were delivered at Nashville by Mr. Lavender's brother, and I gave him a check therefor, payable to the order of G. W. Lavender. This sale occurred a short time before his death. Four or five days afterwards Mr. R. H. Wharton told me about his death, and asked me what I did with the money for the cattle."

Cowan proves that he was present when the cattle were sold to Embry, and says: "Mr. Embry was to pay for the cattle in Nashville, and he was instructed by Mr. Lavender to hand the money over to R. H. Wharton, who was to be in Nashville, stating at the time that Mr. Wharton was his security to the Second National Bank; and if Wharton was not in Nashville, Mr. Embry was instructed to place the money to the credit of the Second National Bank in some bank in Nashville. Lavender made the impression on my mind that his object in selling the cattle was to relieve Wharton as his security by paying off the Second National Bank debt. A few days after this, G. W. Lavender died. He was sick in bed at the time the trade was made."

McDaniel, who had been interested in some cattle transaction with Lavender, and called upon him in his sickness, testifies that Lavender told him about the first sale of the cattle, and the offer of the pur-

chaser to give him $25 to take the cattle. back, and told him further of the kindness of Owen and Stratton, the president and cashier of the Second National. Bank, in letting him have the money to pay off the first purchaser. The witness adds that Lavender said he had sold the cattle to Embry " to settle that debt." He further says: " It was my information from Lavender that he was under obligation to Stratton and Owen to apply the proceeds of these cattle to their debt."

Wharton, the appellant, testifies: " Lavender told me the conditions upon which he got the money, and that he promised Dr. Owen or Mr. Stratton, or both, that the cattle should be theirs for the payment of this money; that he would take the cattle and sell them, and pay the bank the proceeds. They let him have the money on these conditions. This is the way they told me they let him have the money, and the way Lavender told me also. Lavender told me that he had instructed Embry to pay me the money the day the cattle were delivered at Nashville. If I were not there, he directed Embry to place the money in one of the banks at Nashville, to be credited to the Second National Bank of Lebanon, for the payment of the note he owed the bank here. If Embry did neither, Lavender requested me to get the money and pay it anyhow. I considered from the facts in the case that I had the money in trust, that it really belonged to the Second National Bank, and I knew the fact that Lavender so considered it. I heard the first trade, and Embry told me the terms on which.

he bought, and I obtained all this information from Lavender himself."

The testimony of these witnesses leaves not a particle of doubt that Lavender obtained from the bank the money to buy back the cattle, upon an agreement that the cattle should be pledged for the security of the debt, that he would sell them within thirty days, and apply the proceeds to the payment of the debt; that he did sell the cattle accordingly, and at the time give such directions as to the disposition of the proceeds of sale as would, if executed, have carried out the agreement. The Referees find that Lavender borrowed the $700 from the bank to pay for the cattle, and agreed with the president of the bank that he would pay the note with the proceeds of the cattle, and would not hold them longer than thirty days. And they express the opinion, upon these findings of fact, that there was nothing in the contract between Lavender and the bank at the time of the loan which fixed a lien on the cattle or the proceeds, and that there was no subsequent contract between them, either by delivery of the property or otherwise. In reaching their conclusion they ignore the stipulation that the cattle should be pledged for the debt, or treat it as of no effect for some reason, and they also pass over in silence the subsequent acts of Lavender, and his directions as to the disposition of the proceeds of sale.

The defense set up by Wharton in his answer is that the bank agreed, at the time the money was advanced, to take the title to the cattle, the intestate

to hold and sell the same, and pay the proceeds of sale to the bank. And Wharton's testimony of the impression made upon him by the statements of both parties is to the same effect. His answer, except to the charge that there was a check of $710 found among the intestate's papers, is not responsive to any averment in the bill, or call for discovery. It merely states matter in evidence of the liability *prima facie* implied from the existence of the check. The president of the bank, with whom Lavender made the contract, testifies that the bank let the intestate have the money to buy the cattle back on condition that he would not keep the cattle longer than thirty days, and "would pledge the cattle for the payment of the note." The title of the cattle was not to be taken to the bank, but to the intestate. But it is equally clear that the contract was that the cattle, when taken back, were to be considered as pledged to the bank for the payment of the note given for the money borrowed to make the re-purchase. The language of the president in his deposition, "that he (Lavender) would pledge the cattle for the payment of the note," taken by itself, might imply that there was to be a subsequent pledge of the cattle after they had been taken back. But, in view of the entire testimony, this is manifestly not his meaning. No formal act of pledge, nor indeed any further act, was contemplated by the parties to perfect the contract then made. Both parties manifestly understood that by the contract actually made the cattle, when bought back, were *eo instanti* to be considered as pledged for the

payment of the money loaned, and were to be resold by the intestate within thirty days, and the proceeds of sale applied to the payment of the debt.

The Referees were of opinion that the contract they made in parol would not fix a lien on the cattle or their proceeds which would be good against other creditors in the circumstances which have happened. If, indeed, the contract created a valid pledge of the cattle for the security of the loan, the result would be otherwise. If, at the time of the contract, the cattle had been in the possession, and actually owned by Lavender, a delivery of the property, either actual or symbolical to the bank, would have been necessary to perfect the pledge: Story on Bailm., sec. 297. But at that time the title and possession or right of possession were in the first purchasers. And whether, under such circumstances, the contract being in relation to specific property, the pledge might not be perfected by the delivery of the cattle to the pledger as the agent of the pledgee might admit of discussion. For it is well settled that the delivery of the thing pledged need not be made to the pledgee, but may be made to a third person as his agent: *Johnson* v. *Smith*, 11 Hum., 400; *McCready* v. *Haslock*, 3 Tenn. Ch., 13; *Hurst* v. *Jones*, 10 Lea, 8. And the pledger himself may be constituted the agent of the pledgee: *Johnson* v. *Smith*, 11 Hum., 400; *Macomber* v. *Parker*, 14 Pick., 497; *Clark* v. *Iselin*, 21 Wall., 360. The registration laws have no application to such contracts: *Crisp* v. *Miller*, 5 Heis., 697. Nor is there any thing in the suggestion that

such a contract would be void when made with a National Bank. For, even if such a contract be prohibited in express terms by the banking act, which does not appear to be the case, the objection can only be urged by the United States: *National Bank* v. *Whitney*, 103 U. S., 99.

But it is unnecessary to determine this point of the creation of the pledge definitely. For it is certain that the intestate, treating the contract as giving the bank a valid and subsisting lien, either legal or equitable, sold the property under the contract, the sale being completed in his lifetime, and specially directed the money to be appropriated to the payment of the bank debt. The weight of testimony is that the sale was made to pay the bank debt, and that the buyer was instructed to pay the proceeds of sale either to Wharton for his indemnity as security for the debt, or to deposit the same to the credit of the bank. One of the witnesses, who testify to these facts, was present when the sale was made, and heard the instructions. Two other witnesses depose to the statements of the intestate, as to what his instructions were, made in a day or two after the sale. The purchaser, it is true, thinks he was also authorized to pay the money to the intestate's agent, and this agent thinks his brother said the purchaser would pay the money to him. But the alternative direction of depositing the money in a bank at Nashville is not consistent with the recollection of these witnesses. For there could have been no difficulty in depositing the money in bank, if Wharton was not present to

receive it, for the benefit of the Second National Bank of Lebanon. And the probability is that the purchaser, of his own motion, concluded to make the payment directly to the intestate by check.

In this view the contract between the intestate and the bank, being valid as between them, and having been carried out by the intestate in good faith, according to its terms, by a sale of the property and positive direction as to the disposition of fund, if the fund had been disposed of as directed there could be no doubt that the appropriation would have been complete in the lifetime of the intestate. And the question is whether a departure from his instructions, in which he did not concur, shall operate to annul the equitable appropriation. If the check came to his hands it was when he was on his death-bed, and in no condition to take any action in relation to it. The agent says he delivered the check to the intestate's wife, and adds: "I told my brother (the intestate) about bringing the check. He didn't tell me any thing to do with it." The witness says he came back with the check on Tuesday, and his brother died on the following Thursday. Under these circumstances we think the case does fall within the principle of *McGuffey* v. *Johnson*, 9 Lea, 555. There was such an equitable appropriation by the intestate himself of this specific fund to the satisfaction of a particular debt as will not be affected by his subsequent death, and the insolvency of his estate.

The exceptions of the appellant to the Referees' report on this item will be allowed, the chancellor's

decree reversed, and the appellant given a credit therefor. The report will be confirmed and the decree affirmed in other respects. The costs of this court will be paid out of the recovery in the cause, or by the creditors. The appellant will pay the costs of the court below.