**In re MAGAZINE ASSOCIATES, Inc.**

District Court, S. D. New York.

Aug. 5, 1941.

John E. Joyce, of New York City, Referee.

Duberstein & Schwartz, of Brooklyn, for objecting creditor.

Joseph M. Cohen, of New York City, for debtor.

Cullen & Hamilton, of New York City (Chas. C. Cullen, of New York City), for Cuneo Press of Penn, creditor.

Wm. J. Brennan, of New York City, for Charles Scribner's Sons.

Jacob Rubinoff, of New York City, for Publishers Fulfillment Service Co.

Joseph Petchesky and Max Schwartz, both of New York City, for Silver Stationery Co.

Benjamin Bayers, of New York City, for Clarence P. Helck.

Julius S. Smith, of New York City, for Globe Indemnity Co.

Sabin & Puner and Philip Shapiro, all of New York City, for Richard Gilbert, creditor.

Joseph P. Shea, of New York City, for Perkins-Goodwin Co.

KNOX, District Judge.

This matter is before me on a Referee's certificate on review. The point of issue is the propriety of the Referee's order overruling and dismissing a creditor's specifications of objection to the confirmation of an arrangement proposed by the debtor under Chapter XI of the Bankruptcy Act, 11 U.S. C.A. § 701 et seq.

Hearings on the confirmation of the arrangement extended from February 19th to May 21st, 1940. Full briefs were then submitted by both sides. Thereafter, oral argument was had before the Referee.

In view of the careful decision, wherein he details the transactions in controversy, I think it unnecessary to restate the facts involved. It will suffice merely to indicate the essential features of the case. These center about arrangements made for financing Scribner's Magazine from December, 1937, the date of the organization of Harlan Logan Associates, Inc., predecessor of the debtor, to May 3, 1939, when the magazine suspended publication.

On May 25, 1939, the debtor, a corporation which had taken over the ownership of the magazine from Harlan Logan Associates, Inc., filed a petition for reorganization under Chapter X, 11 U.S.C.A. § 501 et seq. Thereafter, the proceeding—without, it is claimed, proper corporate authority therefor—was converted into one under Chapter XI. The arrangement contemplated the acceptance of an offer by Esquire, Inc., to purchase the debtor's active and certain expired subscription lists and to substitute the magazine "Esquire" for "Scribner's." The remaining assets of the debtor were to be liquidated. After payment of costs of administration and priority claims, the debtor proposed pro rata distribution of the proceeds among general creditors. The schedules show unsecured liabilities of $139,012.43, including taxes and wages. Silver Stationery Company, Inc. (hereinafter referred to as the "objectant"), is a creditor in the sum of $1,167.20 for goods sold and delivered.

The meeting of creditors, the first session of which was held on August 29, 1939, was closed on December 4, 1939. No showing has been made that the acceptances were not obtained prior to the latter date. However, they were not placed of record until February 10, 1940, at which time the application for confirmation was filed, accompanied by 103 acceptances out of 131 general claims submitted prior to the close of the meeting. The acceptances covered more than 80 percent in amount of all claims. Throughout the existence of Harlan Logan Associates, Inc., and that of the debtor, all engraving services were performed by the Beck Engraving Company; all composition and electrotyping work was done by Charles Scribner's Sons, Inc.; all paper stock was supplied by Perkins-Goodwin Company; and all printing was done by Cuneo Eastern Press, Inc. These were the four principal creditors. Obviously, if any one of these creditors failed to furnish their respective services or supplies, publication of the magazine would have been impossible. Apparent, too, was the fact that the claims of these four creditors would, as subsequently developed, greatly exceed in amount those of other claimants.

In December, 1937, when the debtor's predecessor, in exchange for its stock, acquired ownership of Scribner's Magazine from Charles Scribner's Sons, the latter donated $8,000 in accounts receivable,

transferred certain tangible assets for a note of $20,046.16, and loaned $20,000 to the purchasing corporation upon another note. At or about the same time, Perkins-Goodwin Company agreed to supply paper for the magazine, Cuneo agreed to print the first five issues of the publication, while Beck agreed to do engraving, and Charles Scribner's Sons the composition and electrotyping work for the first six issues, upon credit. In June, 1938, these creditors agreed to fund the indebtedness then due them. For its claim of $58,483.45, Charles Scribner's Sons, until January 1, 1938, for about fifty years the publishers of the magazine bearing their name, agreed to take nonvoting preferred to the extent of $40,-000, together with a note maturing January 2, 1939, for the balance. The other three agreed to take notes of like maturity for a total indebtedness to them of $78,190.93.

In an uncontested finding of the Referee, he said "None of the obligations to those four creditors incurred up to and including the June issue was secured or paid, except to the extent that Scribner's Sons took preferred stock. The latter also agreed to advance $50,000. as working capital in exchange for preferred stock, and the balance of the subscription was paid in on August 27, 1938. The agreement contemplated that the Logan Company would operate on a cash basis in respect of the printing and publication of the magazine issues after June 1938."

This contemplation, in full, was never realized. Beginning with the October, 1938, issue—the practice was for Perkins-Goodwin Company to deliver paper to Cuneo during the second month preceding the month of issue. Delivery was made upon a stipulation that the paper was not to be released until payment—the practice followed was that, each month debtor's predecessor would assign, by one instrument for each month, certain advertising accounts to Perkins and Cuneo as collateral security for paper used and printing services to be rendered. Assignments of certain proportions of circulation income to Beck and Scribner's Sons followed two months later. The validity of these assignments was unsuccessfully attacked below.

The questions of law decided by the Referee are of interest and practical importance. As a result, statement should be made of some of the reasons which lead me to agree with his conclusions.

■ First, the question of debtor's failure to file the necessary acceptances before the close of the meeting of creditors.

Section 336 of the Act requires that: "at such meeting, or at any adjournment thereof, the judge or referee—* * * (4) shall receive and determine the written acceptances of creditors on the proposed arrangement, which acceptances may be obtained by the debtor before or after the filing of a petition under this chapter."

This section permits the use of acceptances gathered before the initiation of the proceeding in an effort to effect a common-law settlement. Hanna and McLaughlin, Annotations to Bankruptcy Act of 1898 as Amended etc. (1939), page 173. So far as I can see, there is no reason why, from the use of the words "receive and determine," it should necessarily follow that the acceptances should actually go on file before the close of the meeting. Expressly, the statute makes no such requirement. Indeed, Section 362, under which the debtor herein proceeds, it is specifically stated that "* * * an application for the confirmation of the arrangement may be filed * * * after such meeting and after, but not before—(1) it has been accepted in writing" by the requisite number and amount of qualified creditors. If, under this section, acceptance itself may take place after the meeting of creditors, it is hard to see why filing of previously obtained acceptances subsequent to the close of the meeting, but contemporaneously with the filing of an application for confirmation, should be held improper. If objectant's interpretation of the statute should be adopted, it would mean that the conclusion of the creditors' meeting would have the effect of finally determining the matter of acceptance. Section 362 stands in the way of such an interpretation. Even if, as the Referee points out, a contrary view be taken as a matter of statutory construction, the debtor's failure to file the acceptances until it filed its application for confirmation, was a mere irregularity, and should not bar confirmation. In re Branner, 2 Cir., 9 F. 2d 883, decided under old section 12 sub. b, 11 U.S.C.A. § 30, sub. b. Furthermore, on this record, I have no hesitancy in holding that the irregularity, if any, was waived. It appears that, at an adjourned meeting on September 19, 1939, the first of three occasions on which the attorney for the debtor made it clear that the debtor had the requisite acceptances, counsel for the objectant said " * * * I may say that the objection to this so-called Plan is that it is neither fair nor equitable * * *."

■ The second question presented relates to the propriety of the liquidation features in the plan of arrangement. Section 356 contains a mandate that an arrangement under Chapter XI "shall include provisions modifying or altering the rights of unsecured creditors generally or of some class of them, upon any terms or for any consideration."

The plan meets this requirement by the proposed acceptance of the offer of Esquire, Inc., to satisfy claims on account of unfilled subscriptions by delivery of its own magazine. The plan, in my opinion, was not vitiated by inclusion therein of provisions for liquidation and distribution, even though it be assumed that an arrangement, the sole purpose of which is liquidation of the debtor's assets, is not within the scope of Chapter XI. Whatever may have been the law under the composition sections of the old statute, I am quite clear that the terms of the present act force such a conclusion today. Section 306(1) defines an "arrangement" as *any plan* of a debtor for the settlement, satisfaction, or extension of the time of payment of his unsecured debts, *upon any terms.*"

This is extremely broad language. Section 357 enumerates certain permissive—in contradistinction to the mandatory language of Section 356—provisions for arrangements. Thus, under Section 357(5), an arrangement *may* include "provisions for continuation of the debtor's business with or without supervision or control by a receiver or by a committee of creditors or otherwise."

Under 357(8), it may include "any other appropriate provisions not inconsistent with this chapter." Finally, under Section 313 (2), the court may "authorize the receiver or trustee, or the debtor in possession, to lease or sell any property of the debtor, whether real or personal, upon such terms and conditions as the court may approve."

There is the additional consideration that ultimate liquidation of all the assets of a debtor has been held within the scope of a reorganization under 77B, 11 U.S.C.A. § 207, and Chapter X, 11 U.S.C.A. § 501 et seq., proceedings. In re Porto Rican American Tobacco Company, 2 Cir., 112 F.2d 655; In re Central Funding Corporation, 2 Cir., 75 F.2d 256. The generality of Sec-

tion 306(1), under Chapter XI, seems adequate to include the more specific provisions of Section 216(10) under Chapter X and of old Section 77B, sub. b(9) from which 216(10) was drawn and under which the latter case was decided.

The next question has to do with the alleged fraudulent transfers within one year, and preferential transfers within four months prior to the petition, pursuant to a fraudulent "conspiracy" with the four principal creditors, with the alleged consequent prevention of substantial recoveries for the benefit of creditors. On this branch of the case there is little that I can add to what the Referee has written. Viewed against the background of publishing practice described in the opinion of the Referee, the proof falls short of establishing that the assignments of accounts receivable were not perfectly valid security transactions. Greey v. Dockendorff, 231 U.S. 513, 34 S.Ct. 166, 58 L.Ed. 339.

Work on the magazine by the four principal creditors started in the second month preceding the month of issue. Perkins delivered the paper to Cuneo. Cuneo received copy of the issue. Scribner's Sons and Beck did the greater part of the composition and electrotyping, and engraving, respectively, at this early date. It then became necessary to assign certain advertising accounts to Perkins and Cuneo. While the cost of paper for an issue was "readily ascertained," Cuneo furnished an "estimate" of the cost of printing; the debtor's predecessor "estimated" the advertising income to be derived from the issue. A month or two later it became necessary to assign certain proportions of circulation income to Beck and Scribner's Sons. Here again this income had to be "estimated." As the Referee said "The amount of their bills, unlike those for merchandise, was not known until their work on an issue was done. The amount of the circulation income was not known or received until at least two months after the issue was circulated."

Mathematical exactitude was impossible under these circumstances. In cases involving the use of book accounts as collateral security, the courts look to the degree of particularity with which the security res is determined. Certainly, however, no greater degree of particularity than is possible under business conditions is required. These considerations, I think, together with others, rid the assignments of the imputation of fraud as a matter of law. The Referee has found that "there was no transfer fraudulent ·in fact."

On the subject of the alleged insolvency of the predecessor of the debtor, which the Referee found not to have been established, I may add that the argument of counsel for the debtor on this part of the case is most persuasive. It is, as stated in his main brief, that the predecessor of the debtor solicited the assignment arrangement for the purpose of assisting in its continued existence, and, since the former was on a cash in advance basis with the four principal creditors, in consenting to the assignments, the latter were taking a less favorable position instead of one that may be said to have been preferential.

A further contention is the alleged violation of the doctrine of Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991. The principle of this case is based upon the question of whether the parties have created a security device or a sham. What is condemned by the Supreme Court as fraudulent in law is "the reservation of dominion * * * inconsistent with the effective disposition of title and creation of a lien"; "the assignment must be deemed fraudulent in law if it is agreed that the assignor may use the proceeds as he sees fit." Brandeis, J., in Benedict v. Ratner, supra. The Referee has found, as a matter of fact, that there is no proof either of the reservation of unfettered dominion or of the forbidden agreement. On the proof, I certainly cannot say that he is clearly wrong. So far as decisions are concerned, I think more questionable security transactions than those under the instant discussion have been upheld in this jurisdiction. Chapman v. Hunt, 2 Cir., 254 F. 768; In re Michigan Furniture Company, D.C., 249 F. 978. An agreement that the assignor of accounts shall collect them and pay the proceeds to the assignee will not invalidate the assignment which it accompanies. Young v. Upson, C.C., 115 F. 192; Benedict v. Ratner, supra. If it is agreed that the transferor may use the original collateral for his own purposes upon the substitution of other of equal value, the transfer is not thereby invalidated. Clark v. Iselin, 21 Wall. 360, 22 L.Ed. 568; Chapman v. Hunt, supra; Benedict v. Ratner, supra.

The remaining two questions may shortly be disposed of. Oral objection was made that corporate authority was

lacking for converting the proceeding into one under Chapter XI. Royal Indemnity Company v. American Bond and Mortgage Company, 289 U.S. 165, 53 S.Ct. 551, 77 L.Ed. 1100, seems determinative against the standing of a creditor to make such a challenge. As to the attempt of objectant to invoke the corporate instrumentality rule, I agree that it is not a proper part of this controversy. Scribner's Sons, not being a party, would not be bound by a ruling at this time, and would have to be heard.

The petition to review is in all respects dismissed and the Referee's order affirmed.