## CLARK, ASSIGNEE, v. ISELIN.

1. When a person, borrowing money of another, pledges with that other a large number of bills receivable as collateral security for the loan (many of them overdue) the pledgee may properly hand them back to the debtor pledging them, for the purpose of being collected, or to be replaced by others. All money so collected is money collected by the debtor in a fiduciary capacity for the pledgee. And if a portion of the collaterals are subsequently replaced by others, the debtor's estate being left unimpaired, and the transaction be conducted without any purpose to delay or defraud the pledgor's creditors, or to give a preference to any one, the fact that proceedings in bankruptcy were instituted in a month afterwards and the pledgor was declared a bankrupt, will not avoid the transaction.

2. The giving, by a debtor, for a consideration of equal value passing at the time, of a warrant of attorney to confess judgment, or of that which, under the code of New York, is the equivalent of such warrant, and there called a "confession of judgment," is not an act of bankruptcy, though such warrant or "confession" be not entered of record, but on the contrary be kept as such things often or ordinarily are, in the creditor's own custody, and with their existence unknown to others. The creditor may enter judgment of record on them when he pleases (even upon insolvency apparent), and issue execution and sell. Such his action is all valid and not in fraud of the Bankrupt law unless he be assisted by the debtor.

3. A creditor, having by execution obtained a valid lien on his debtor's stock of goods, of an amount in value greater than the amount of the execution, may, up to the proceedings in bankruptcy, without violating any provision of the Bankrupt Act, receive from the debtor bills receivable and accounts due him, and a small sum of cash, to the amount of the execution; the execution being thereupon released, and the judgment declared satisfied.

ON appeal and cross-appeal from the Circuit Court for the Southern District of New York.

Clark, assignee in bankruptcy of Dibblee & Co., filed a bill in the District Court of the district just named against Iselin & Co., to recover certain assets which the bill charged were made over to them in fraud of the Bankrupt law; an act whose thirty-fifth section is in these words:

" If any person, being insolvent, or in contemplation of insolvency, within four months before the filing of the petition by or against him, with a view to give a preference to any creditor, or person having a claim against him, or who is under any liability for him, procures any part of his property to be attached, sequestered, or seized on execution, or makes any payment, pledge, assignment, transfer, or conveyance of any part of his property, either directly or indirectly, absolutely or conditionally, the person receiving such payment, pledge or assignment, transfer or conveyance, or to be benefited thereby, or by such attachment, having reasonable cause to believe such person is insolvent, and that such attachment, payment, pledge, assignment, or conveyance is made in fraud of the provisions of this act, the same shall be void, and the assignee may recover the property, or the value of it, from the person so receiving or so to be benefited."

Upon the hearing a decree was made granting the relief asked for, in part, and in part refusing it; and on appeal to the Circuit Court this decree of the District Court was affirmed.   Both parties now appealed to this court.

The firm of Dibblee & Co., jobbers, was formed in January, 1866, continued in business till May, 1869, and on the petition of creditors, filed May 3d, 1869, was adjudged bankrupt June 2d, 1869.

The defendants, Iselin & Co., were bankers, doing business in the city of New York, and as such had various dealings with the firm of Dibblee & Co., who from time to time required commercial facilities; advancing to them money on the pledge of bills receivable, which Dibblee & Co. had received in the course of their business.

On the 6th of August, 1868, they borrowed from the de-

fendants $61,000, for which they gave their four notes, payable one in September, one in October, one in November, and the other in December of that year, and at the same time they transferred to the defendants, as collateral security for the loan, one hundred and forty-seven bills receivable by them, amounting in the aggregate to $72,170.42. Many of these bills were past due when they were pledged. On the day next following the loan the notes held as collateral were returned to Dibblee & Co. for convenience of collection, to be collected for account of the defendants, or to be replaced by others.

Of the four notes discounted by Iselin & Co., on the 6th of August, 1868, the one which fell due in September was paid at maturity, and the collaterals pledged for it were surrendered. The other notes were not paid when they fell due, but were renewed from time to time and extended, and the collaterals held by them were in part replaced by others.

Thus, on the 4th day of December, 1868, the day when the bankrupts' last note matured, the amount of the collaterals pledged to the defendants was $63,240.61, and they were all, or nearly all, good. It did not appear that any of them were uncollectible. For some of these others were substituted up to January 15th, 1869, and on the 5th of April, 1869, the amount of collaterals pledged for the payment of the three notes given by the bankrupts was either $63,318.89 or $65,013.15. On that day they were all withdrawn, and others, amounting to $62,027.34, were contemporaneously pledged in their stead.

This pledge was sustained by the decrees below, and the assignee appealed.

On the 8th of April, 1869, Dibblee & Co. paid to Iselin & Co. $7944.88, being the principal and interest of certain loans made without security prior to the 30th of November, 1868. The evidence showed that Dibblee & Co. were paying their debts generally, as they matured. This payment also was sustained by the decree, and the assignee appealed.

There were some other transactions which the assignee called in question, which were sustained, and from which

the assignee appealed, but which need not be more particularly mentioned.

A transaction, however, which both courts set aside, and over which there was much more doubt and argument everywhere than about the others which it sustained, was of this sort.

On the 25th of February, 1869, Dibblee & Co. gave a judgment note, in the form authorized by the New York code, to secure $54,100 lent by the defendants to them. This sort of note had what is called "a confession of judgment" on it. The maker declares that he "confesses judgment in favor of A. B." for such a sum, and "authorizes judgment to be entered therefor" against him. It is the equivalent of the old "warrant of attorney." A portion of the sum of $54,000, mentioned in this note, had been advanced on the 21st of February, and a judgment bill then given; another portion on the 23d of February, for which a similar security was then given, and the remainder was advanced February 24th. On the 25th of that month the previous confessions of judgment were given up and destroyed, and one confession for the entire loan, $54,100, was taken as above mentioned. The advances for which this confession was taken were made in negotiable State and railroad bonds, of a larger nominal value, but they were taken by Dibblee & Co. at their cash value at the time. They were made to enable the bankrupts to borrow money, and upon depositing the securities lent as collateral they obtained $46,000 from three banks with which they did business.

The confession of judgment was held by the defendants without entry of record until April 30th, 1869, when judgment was entered upon it in the Supreme Court, as the bill averred at the request of the defendants, and an execution was issued and levied *upon the debtor's stock of goods, considerably greater in value than the amount of the debt.* On the next day (May 1st), at the request of the debtors, they paid to the banks with which the bonds lent had been pledged the sums for which they were held, and took up the collaterals and notes. Thus a payment was effected on the judgment of

the difference between the amount of the notes and the collaterals. Then Dibblee & Co. paid $1900 in cash, and transferred bills receivable and accounts owned by them, amounting to $47,839.52, in satisfaction of the balance of the judgment, and the levy was released.

The Circuit Court decided that the mere giving of the judgment note was legitimate, but held the subsequent transaction to be fraudulent, as in conflict with the Bankrupt Act, and decreed that the assignee of the bankrupts should recover from the defendants the amount received by them from the securities transferred on the 1st of May, together with the $1900 paid to them in cash, and the value of the securities redeemed by them from the banks, above the sums which they paid for the redemption. From this part of the decree Iselin & Co. appealed, asserting that the payment, and the transfer of securities made to them by Dibblee & Co. on the 1st of May, was not a preference in fraud of the Bankrupt Act, or any preference at all.

We return now to the transactions previous to the one last mentioned (from which the defendants appealed), and state the testimony bearing upon them.

The complainant alleged that the notes discounted by the defendants for the bankrupts in August, 1868, were mere renewals, and renewals of notes previously unsecured. However, the testimony established that Iselin & Co. were fully covered with collaterals for these discounts, from the time that they originated, and that the moneys collected by Dibblee & Co., on the collaterals temporarily intrusted to them, were, until replaced, regarded as the specific property of Iselin & Co., and to be paid over by Dibblee & Co. to Iselin & Co.

The testimony further showed that Dibblee & Co. were making preparations for extending their business during the then approaching "season."

Two members of the firm were examined as witnesses.

One of them thus testified:

"Up to April 30th, I never heard the solvency of our house questioned, nor had I any reason to suppose that it would sus-

pend. *A week or ten days before that Mr. Dibblee had said to Mr. Bingley and myself, that we had a good prospect* for the coming season. Up to the 30th day of April, 1869, I had no reason to suppose that the house was not perfectly solvent."

Another thus:

" Though I knew little of the financial condition of Dibblee & Co., on the 30th April, 1869, I was led to believe by Mr. Dibblee's acts and from the circumstance that a few days before he directed me to re-engage certain salesmen for the approaching season, that we were on that day solvent. I did not, of my own knowledge, know of such solvency. Up to that time, however, I never heard it questioned."

Both of these witnesses were partners in the house of Dibblee & Co., and attended to the purchases and sales made by the house, and were therefore in intercourse with the parties who sold the house goods. It seemed, therefore, that they would have been the first to hear any question as to the credit of the house being doubted.

A witness of the complainant, who, as an expert, had examined their books lately, testified that Dibblee & Co. were insolvent on the 1st day of August, 1868, to the extent of at least $75,000, and to a like amount for months previous to that date. However, subsequently to that date, the defendants purchased in the market Dibblee & Co.'s notes to the amount of over $80,000, more than $47,000 being unsecured.

On the 13th of April, 1869, a firm in which one of the Iselins was a special partner, sold goods to Dibblee & Co. upon credit for over $24,000, and the amount due them from Dibblee & Co., at the time of the adjudication in bankruptcy, and proved before the register, was $8351, one of the largest debts proved.

As already said, the court below sustained all the transactions except the last. That one it held fraudulent.

*Mr. James Emott, for Clark, the assignee in bankruptcy:*

1. *With regard to the debt of August 6th,* 1868, *for* $61,000. The evidence shows that Dibblee & Co. immediately took

back and retained the so-called collaterals, and collected the money as if it had been their own. They doubtless used it in the same way. The whole transaction, in short, was an attempt by Iselin to escape the penalties of the Bankrupt Act, bolster up the credit of what he knew to be a failing house, and enable Dibblee & Co. to keep working along, so that he might ultimately, at all events, secure the payment of *his* debt.

The transactions and shiftings about the so-called "collaterals" connected with this loan were sustained by the court below, doubtless, as being a mere exchange of collaterals. But herein lies the fallacy. Up to the time of hopeless and notorious insolvency, the securities were in the possession of Dibblee & Co. Iselin & Co. had, in truth, no collaterals; and when collaterals were really transferred, Dibblee & Co. had been insolvent for months. It is the case, therefore, of an old and unprotected debt secured in the very view of approaching failure. The case of *Buchanan* v. *Smith*[*] covers this part of the case.

2. *The payment of April 8th*, 1869. This payment was made when the firm of Dibblee & Co. were certainly insolvent. Iselin & Co. must have known that fact. They were substantially the backers of Dibblee & Co. The fact that the firm was still paying other debts, got with money raised through fraudulent and secreted warrants of attorney to confess judgment, does not help them.

So far as to transactions sustained by the court below, and as to which we appeal.

3. *As to the confessions of judgment.* We take no appeal as to the action of the court below as to this. That court set it aside. That this action was right we think plain.

The security was an extraordinary one—not in the usual course of business, and one which, of itself, is evidence both of the debtor's precarious condition and of the creditor's knowledge of it.[†]

The debtor was hopelessly insolvent and on the verge of

* 16 Wallace, 277.      † Walbrun v. Babbitt, 16 Wallace, 577.

bankruptcy when the *confession* was filed and the judgment entered. The preference by means of the judgment was not given or obtained when the paper authorizing the judgment was executed and delivered to the creditors, but when it was used and the judgment was entered. Until then there was only a continuing consent or authority; the act was done when the authority was used, and the validity of the act depends upon the conditions existing at that time.*

No doctrine of relation will be recognized by the courts, which would make an act which was invalid and a fraud upon the Bankrupt law at the time when it occurred, legal and valid, because it was promised or agreed to previously, when the circumstances of the parties were different.

In the language of Judge Hall, in *Graham* v. *Stark*,†

"The doctrine would defeat the purposes of the Bankrupt Act. It would be easy, in every case where it was desired, to give a fraudulent preference to a relative or other favored creditor, to make such a contract for security when called for; and such agreements would be in effect secret liens upon the property of the debtor, and enable him to effect the objects generally effected before the Bankrupt law under promises to secure relatives and indorsers against loss in any event, by assignments made for the benefit of such favorite creditors."

If a creditor could hold a warrant of attorney or " confession of judgment" without causing it to be entered of record, the debtor could readily obtain a false credit.

But the transaction which was set aside by the decree was even more than this. They went further than to confess a judgment and suffer a seizure; after they had committed an act of bankruptcy, they paid this debt of Iselin & Co. by turning over to the latter all their good assets, their bills receivable and accounts. It is not important that the Iselins in fact reaped no advantage from this payment or transfer of securities. If they had not expected to do so, and if it

---

* Bank of Leavenworth *v.* Hunt, 11 Wallace, 391.

† 3 National Bankruptcy Register, 93; and see Bank of Leavenworth *v.* Hunt, 11 Wallace, 391.

had not been intended that they should, the transfer would not have been made. The assignee in bankruptcy had a right to the property of the bankrupts in an unchanged condition. He might have contested the levy, stayed the sale of the goods, and had the goods or their proceeds in court, to abide the event. The bankrupts and their favored creditors had no right to turn him over to an action against parties who might or might not be responsible, to recover the value of property to which they had no right.

*Messrs. H. W. Clark and S. P. Nash, contra, for Iselin & Co.*

Mr. Justice STRONG delivered the opinion of the court.

It is argued by the counsel for the assignee that the return to Dibblee & Co. for collection of the notes transferred to secure the loan of August 6th, 1868, for $61,000, destroyed the title of Iselin & Co. to them. The notes, however, were returned to Dibblee & Co. for convenience of collection, to be collected for account of the defendants or to be replaced by others.

Obviously this deposit in no degree affected the title of the defendants to the notes. It merely facilitated collections. In *White* v. *Platt*,* it was said by the court that " where promissory notes are pledged by a debtor to secure a debt, the pledgee acquires a special property in them. That property is not lost by their being redelivered to the pledgor to enable him to collect them, the principal debt being still unpaid. Money which he may collect upon them is the specific property of the creditor. It is deemed collected by the debtor in a fiduciary capacity."

It is further argued in behalf of the assignee, that the pledge, on the 5th of April, 1869, of the collaterals, amounting to $62,027.34, was void, because made at that date. The transaction, however, was a mere exchange of securities. The new collaterals were not pledged to secure an unsecured debt, or to give any preference to the defendants. They

* 5 Denio, 269.

were no addition to what the defendants had before; to what they had held from August 6th, 1868, when the loan to Dibblee & Co. was made. The exchange, therefore, withdrew nothing from the creditors generally which had not long before been withdrawn. The defendants owned the securities they then surrendered, and by surrendering them they enlarged the debtors' estate to the extent of the securities received in exchange. In *Cook* v. *Tullis*,* we held that there is nothing in the Bankrupt law which prevents an insolvent from dealing with his property—selling or exchanging it for other property—at any time before proceedings in bankruptcy are taken by or against him, provided such dealing be conducted without any purpose to delay or defraud his creditors, or to give a preference to any one, and does not impair the value of his estate. The same doctrine was asserted in its fullest extent in *Tiffany* v. *Boatman's Savings Institution*.†

It is argued on behalf of the assignee that the notes discounted by the defendants for the bankrupts in August, 1868, were a mere renewal of an antecedent debt, and not a loan or a discount at that time. If this be conceded it will not help the assignee. The transaction, whatever it was, was nine months before the petition for bankruptcy was filed, and nothing in the thirty-fifth section of the Bankrupt Act would justify its disturbance. But it is said the transfer of collaterals to secure the notes was a fraud and a sham, and this is asserted because the collaterals were placed in the hands of Dibblee & Co. for collection on account of the defendants. We do not think so. It has been said already, and decided, as we have noticed, that a pledgee does not lose his property in collaterals pledged to him by putting them into the hands of the pledgor for collection. In this case there was peculiar reason for allowing Dibblee & Co. to collect them for the defendants. Many of them, nearly all, were past due. They could not, therefore, be collected through banks, and the convenience of all parties was sub-

---

* 18 Wallace, 332.                              † Ib. 375.

served by placing them where the debtors might be expected to come.  If, then, the property in these collaterals was by the pledge vested in the defendants, and remained in them until they or their proceeds were surrendered for other collaterals, as we think it was, the subsequent exchanges, though made within four months next prior to the petition in bankruptcy, were not a fraud upon the Bankrupt law. The exchanges amounted to no preference.  They took nothing from the debtor's estate.  The general creditors lost nothing thereby.  Such was the opinion of both the District and the Circuit Court, and with that opinion we concur.

Little need be said respecting the other particulars in regard to which the assignee complains of the decree in the Circuit Court.  The payment of $7944.88 on the 8th of April, 1869, and the payments in discharge of the call loans were made in the regular course of business.  It is not denied that they were in discharge of debts due to the defendants, and it is not denied that at the times when they were made Dibblee & Co. were paying their other creditors as their claims matured.  There is nothing in those transactions that shows any intended preference.  And in reference to all the transactions between the defendants and the bankrupts prior to April 30th, 1869, we may remark that we find no evidence in the record that the latter contemplated bankruptcy.  It is highly probable that they were in fact insolvent, but their whole conduct, as well as the testimony of two of them, shows that they did not anticipate any interruption of their business.  In fact, they were planning its enlargement.  And there is no sufficient evidence that the defendants knew, or had reason to believe that the bankrupts were insolvent.  Up to January, 1869, they were buying the unsecured notes of the bankrupts in the market, until they had obtained them to an amount exceeding $47,000. In February, 1869, they lent the bankrupts bonds and other securities amounting to $54,100, taking, it is true, a confession of judgment, which they did not enter until April

30th, 1869. About the middle of April a firm in which one of the defendants was a partner sold the bankrupts goods on credit for more than $24,000, and late in March, and at divers times in April, down to the 30th, the defendants themselves lent the bankrupts sums amounting to $20,000, without any security, except in part a confession of judgment never entered. In view of these facts it cannot be said the defendants knew the bankrupts were insolvent. Nor can we discover in the whole case anything that should have led them to suspect insolvency. Nobody else suspected it, why should they? If, then, the bankrupts intended no preference in fraud of the Bankrupt Act in any of their dealings with the defendants prior to April 30th, 1869, and if the defendants had no knowledge of the insolvency of the bankrupts prior to that day, or any reasonable cause to believe they were insolvent, what ground is there for impeaching those dealings? We think there is none, and, hence, that the assignee in bankruptcy has no just cause to complain that the decree of the Circuit Court was not at least as favorable to him as he had any right to claim.

But the defendants below have also appealed. The Circuit Court decreed partially against them. On the 25th of February, 1869, Dibblee & Co. gave a judgment note or bill, in the form authorized by the New York code, to secure $54,100 loaned by the defendants to them. A portion of this sum had been advanced on the 21st of February, for which a judgment bill was then given; another portion on the 23d of February, for which a similar security was then given, and the remainder was advanced February 24th. On the 25th of that month the previous confessions of judgment were given up and destroyed, and one confession for the entire loan, $54,100, was taken by the defendants. The advances for which this confession was taken were made in negotiable State and railroad bonds, of a larger nominal value, but they were taken by the bankrupts at their actual cash value at the time. They were made to enable the bankrupts to borrow money, and upon depositing the securities lent as collateral they obtained $46,000 from three banks

with which they did business. That this transaction thus far was perfectly legitimate can hardly be doubted, and so it was regarded by the court below. The bankrupts acquired property by it to the full value of the security they gave. They parted with nothing that they then had. If the defendants had known that they were insolvent at the time it would make no difference. The confession of judgment was not given for a pre-existing debt. And if it had been, the defendants had, as we have stated, no reasonable cause to believe that the debtors were insolvent. We may assume, therefore, that the confession of judgment is unimpeachable. It was held by the defendants without entry of record until April 30th, 1869, when judgment was entered upon it in the Supreme Court, as the bill avers, at the request of the defendants, and an execution was issued and levied upon the debtors' stock of goods, greater in value than the amount of the debt. Thus the defendants obtained a lien upon the goods, a full security for the debt due them. On the next day (May 1st), at the request of the debtors, they paid to the banks with which the bonds loaned had been pledged the sums for which they were held, and took up the collaterals and notes. Thus a payment was effected on the judgment of the difference between the amount of the notes and the collaterals. Then Dibblee & Co. paid $1900 in cash, and transferred bills receivable and accounts owed by them, amounting to $47,839.52, in full satisfaction of the balance of the judgment, and the levy of the execution was released.

This transaction the Circuit Court held to be fraudulent, as in conflict with the Bankrupt Act, and decreed that the assignee of the bankrupts should recover from the defendants the amount received by them from the securities transferred on the 1st of May, together with the $1900 paid to them in cash, and the value of the securities redeemed by them from the banks, above the sums which they paid for the redemption. It is from this part of the decree that the defendants below have appealed, and they now contend the payment, and the transfer of securities made to them by

Dibblee & Co. on the 1st of May, was not a preference in fraud of the Bankrupt Act, or any preference at all.

Whether it was or not obviously depends upon the answer which must be given to the question, "Was it a transfer of property for a sufficient present consideration, or was it a transfer to satisfy or secure an antecedent debt or liability?" The confession of judgment given on the 25th of February was, as we have seen, a security to the defendants for a loan then made, not a security for a pre-existing debt. Giving and receiving that paper, therefore, cannot be considered a preference of creditors. The defendants had a clear right to take and to hold it, and the borrower had a clear right to give it. Besides, as already remarked, it does not appear from the evidence that at that time Dibblee & Co. were insolvent. It must, therefore, be concluded, as it was by the court below, that there was nothing in that transaction which was fraudulent in fact, or fraudulent as against the Bankrupt law. The confession was not itself a judgment, but it authorized the defendants to cause a judgment to be entered without the knowledge of the debtors, and even against their protest. Was, then, the subsequent entry of the judgment, and the issuing of an execution thereon, followed by a levy on the debtor's goods, obtaining an unlawful preference? The court below thought it was, but such is not our opinion. It must be conceded that on the 30th day of April, when the defendants caused the judgment to be entered, the execution to issue, and the levy to be made, they knew that Dibblee & Co. were insolvent; but that knowledge is not of itself sufficient to invalidate the judgment and execution. A creditor may pursue his insolvent debtor to judgment and execution, with full knowledge of the insolvency, notwithstanding the provisions of the Bankrupt Act, provided the debtor does nothing to aid the pursuit. If there be no collusion between the debtor and the creditor, the ordinary remedies of the law are open to the latter. In *Wilson* v. *The City Bank,*\* it was decided by this court that when a debt is

---

\* 17 Wallace, 473.

Opinion of the court.

due, and the debtor is without just defence to the action, "something more than passive non-resistance of an insolvent debtor to regular judicial proceedings, in which a judgment and levy on his property are obtained, is necessary to show a preference of a creditor, or a purpose to defeat or delay the operation of the Bankrupt Act, and that though the judgment creditor in such a case may know the insolvent condition of the debtor, his levy and seizure are not void under the circumstances, nor any violation of the Bankrupt law." It was also decided that a "lien thus obtained by the creditor will not be displaced by subsequent proceedings in bankruptcy against the debtor, though obtained within four months from the filing of the petition." It is true that in *Wilson* v. *The City Bank* the judgment under review and the execution thereon were obtained in an ordinary suit at law, to which the debtor made no defence, but allowed the judgment to be taken by default. In this case the judgment was entered by the creditor in virtue of what is called a confession previously made, equivalent to a warrant of attorney to confess a judgment. But it is impossible that can make any difference in its validity. The confession having been lawful when it was given, the subsequent use of it by the creditors according to its legal effect, a use to which the debtors were not parties, and of which they had no knowledge, cannot be illegal. If it is, it must be because it is made so by the thirty-fifth section of the Bankrupt Act.* But a careful examination of that section will show that the mere entry of a judgment against an insolvent debtor, by virtue of a warrant of attorney, though entered just before the proceedings in bankruptcy are commenced, and when the creditor knows his debtor is insolvent, and though followed by an execution, is not such a preference as the statute avoids. Something more is needed to make it an unlawful procurement of a preference.

To bring the case of a judgment and execution, or attachment, within the thirty-fifth section of the Bankrupt Act, several things must concur:

---

* See the section quoted, *supra*, p. 361.

1. The debtor must have procured the judgment and attachment of his property.

2. He must have procured them within four months next prior to the filing of the petition in bankruptcy by or against him.

3. He must have been insolvent, or contemplating insolvency, at the time, and he must have procured the judgment and execution with a view to give a preference to the judgment creditor.

4. The creditor must have had reasonable cause to believe that the debtor was insolvent, and that the judgment and execution were given in fraud of the provisions of the Bankrupt Act.

We say these things must concur. And they must concur not only in fact, but in time also. The words of the thirty-fifth section admit of no other construction. The debtor must be insolvent, or contemplating insolvency, *when* the alleged preference is given. And he must *then* have in view giving a preference. He must procure the attachment or the entry of the judgment, the execution, and the levy, with a present intention to prefer the creditor. The unlawful view to a preference must coexist with the procurement. It is not enough that it precedes the entry of the judgment and the levy of the execution, or that it follows. And the creditor, *when* he obtains the judgment and execution, must have reasonable cause to believe not only that the debtor is insolvent, but that the attachment is made (made or caused by the debtor) in fraud of the provisions of the act. In fine, there must be guilty collusion to constitute the fraudulent preference condemned by the statute.

Now, in a case where a creditor, holding a confession of judgment perfectly lawful when it was given, causes the judgment to be entered of record, how can it be said the debtor procures the entry at the time it is made? It is true the judgment is entered in virtue of his authority, an authority given when the confession was signed. That may have been years before, or, if not, it may have been when the debtor was perfectly solvent. But no consent is given

when the entry is made, where the confession becomes an actual judgment, and when the preference, if it be a preference, is obtained. The debtor has nothing to do with the entry. ˙As to that he is entirely passive. Ordinarily he knows nothing of it, and he could not prevent it if he would. It is impossible, therefore, to maintain that such a judgment is obtained by him *when* his confession is placed on record. Such an assertion, if made, must rest on a mere fiction. And so it has been decided by the Supreme Court of Pennsylvania.* More than this, as we have seen, in order to make a judgment and execution against an insolvent debtor a preference fraudulent under the law, the debtor must have procured them with a view or intent to give a preference, and that intent must have existed when the judgment was entered. But how can a debtor be said to intend a wrongful preference at the time a judgment is obtained against him when he knows nothing of the judgment? That years before he may have contemplated the possibility that thereafter a judgment might be obtained against him; that long before he may have given a warrant of attorney to confess a judgment, or by a written confession, as in this case, have put it in the power of his creditor to cause a judgment to be entered without his knowledge or subsequent assent, is wholly impertinent to the inquiry whether he had in view or intended an unlawful preference at a later time, at the time when the creditor sees fit to cause the judgment to be entered. For, we repeat, it is a fraudulent intent existing in the mind of the debtor at this later time which the act of Congress has in view. The preference must be accompanied by a fraudulent intent, and it is that intent that taints the transaction. Without it the judgment and execution are not void.

This construction of the act of Congress, which appears to us to be the only one of which it is susceptible, necessitates the conclusion that the entry of the judgment against Dibblee & Co. on the 30th of April, 1869, the issue of the exe-

---

* Sleek *v.* Turner's Assignee, Legal Intelligencer, September 25th, 1874.

cution thereon, and the levy upon the debtors' stock, were
not fraudulent; that they were not a procurement by the
debtor of a seizure of his property with a view on his part
to give a preference to the defendants, within the meaning
of the thirty-fifth section.

It has been suggested in opposition to the view we have
taken, that if a creditor may hold a confession of judgment
by his debtor, or a warrant of attorney to confess a judg-
ment, without causing it to be entered of record until the
insolvency of the debtor appears, the debtor may thereby be
able to maintain a false credit.   If this be admitted it is not
perceived that it has any legitimate bearing upon the ques-
tion before us.   The Bankrupt Act was not aimed against
false credits.   It did not prohibit holding judgment bonds
and notes without entering judgments thereon until the
debtors became embarrassed.   Such securities are held in
some of the States amounting to millions upon millions.
The Bankrupt Act had a very different purpose.   It was to
secure equality of distribution of that which insolvents have
when proceedings in bankruptcy are commenced, and of
that which they have collusively with some of their creditors
attempted to withdraw from ratable distribution, with intent
to prefer some creditors over others.   There is much in the
language of the court in *Wilson* v. *The City Bank**\** that con-
firms the opinion we express.

If, then, the entry of the judgment, the execution, and the
levy, on the 30th of April, 1869, were not a forbidden prefer-
ence, as we have endeavored to show they were not, the
transaction on the next day, May 1st, was unimpeachable.
It was only an exchange of values.   The debtors transferred
to the execution creditors bills receivable and other securi-
ties, together with $1900 in cash, the whole value being
equal to the amount of the judgment, and received back the
goods upon which the execution had been levied.   Those
goods were of greater value than the securities transferred
and the money paid.   It is not claimed that the defendants

---

\* See the case, 17 Wallace, 473, and especially the remarks upon pages
486 and 487.

obtained more than they gave in return. The exchange, instead of impairing the debtors' estate, actually benefited it. It saved the stock levied upon from the expense and sacrifice of a forced sale. It was, therefore, such an exchange as the debtors might lawfully make and as the creditors might lawfully accept. This is determined by *Cook* v. *Tullis*,* and *Tiffany* v. *Boatman's Savings Institution*.†

DECREE WHOLLY REVERSED, and the cause remanded, with instructions to proceed

IN ACCORDANCE WITH THIS OPINION.

Justices HUNT, CLIFFORD, and MILLER dissented. See next case, *infra*, p. 381.

---

NOTE.

At the same time with the preceding case was adjudged the case of