(109 So. 834)

No 26794.

**CANAL–COMMERCIAL TRUST & SAVINGS BANK v. NEW ORLEANS, T. & M. RY. CO.**

(June 28, 1926. Rehearing Denied Oct. 5, 1926.)

*(Syllabus by Editorial Staff.)*

**1. Commerce ⊛⇒8(12).**

Obligations of carrier as to an interstate shipment are to be determined by Act Cong. Aug. 29, 1916 (U. S. Comp. St. § 8604aaa et seq.) relating to bills of lading in interstate and foreign commerce substantially similar to La. Act No. 94 of 1912.

**2. Carriers ⊛⇒57—Pledgee of negotiable bill of lading, pledged as collateral security for loan, held not to annul pledge and lose his lien on goods by returning bill to pledgor temporarily on trust receipt (U. S. Comp. St. §§ 8604aaa et seq.; La. Act No. 94 of 1912; Civ. Code, art. 3162).**

Pledgee of negotiable bill of lading, pledged as collateral security for a loan, in view of Act Cong. Aug. 29, 1916 (U. S. Comp. St. § 8604aaa et seq.), substantially similar to La. Act No. 94 of 1912, and Civ. Code, art. 3162, *held* not to annul pledge and lose his lien on goods by returning bill of lading to pledgor temporarily on a trust receipt, as against carrier stopping shipment in transit and diverting it to shipper, not on strength of, but in spite of, consignee's having possession of bill of lading.

**3. Trusts ⊛⇒105.**

Person who withdraws on trust receipt collateral securities which he has pledged to secure a debt holds the securities in a fiduciary capacity as trustee for account of pledgee, in view of Act No. 120 of 1910.

Appeal from Civil District Court, Parish of Orleans; Wm. H. Byrnes, Judge.

Action by the Canal-Commercial Trust & Savings Bank against the New Orleans, Texas & Mexico Railway Company, in which the International Trading & Rice Company was called in warranty to defend the suit. Judgment for plaintiff, and defendant and warrantor appeal. Affirmed.

George Janvier, Monroe & Lemann, and Walter J. Suthon, Jr., all of New Orleans, for appellants New Orleans, T. & M. Railway Co. and International Trading & Rice Corporation, Inc.

Dart & Dart, of New Orleans, for appellee.

O'NIELL, C. J. The question in this case is whether a pledgee of a negotiable bill of lading, pledged as collateral security for a loan, annuls the pledge and loses his lien on the goods if he returns the bill of lading to

the pledgor, temporarily, on a trust receipt.

The facts of the case are not disputed. The International Trading & Rice Corporation sold to Bishop C. Perkins Company, through a broker, in New Orleans, a carload of sugar, being 600 pockets of 100 pounds each, at $7.90 per 100 pounds, less 2 per cent. 10-days discount. The American Sugar Refining Company shipped the sugar, on the order and for account of the International Corporation, from Three Oaks (near New Orleans), La., to Houston, Tex., and issued and delivered to Bishop C. Perkins, for Bishop C. Perkins Co., a negotiable bill of lading for the shipment, "consigned to order of Bishop C. Perkins Company, Houston, Tex. * * * Notify Central Warehouse & Forwarding Co. at Houston, Tex." On the same day Bishop C. Perkins, for his company, borrowed from the Canal-Commercial Trust & Savings Bank, in New Orleans, $4,700, on a promissory note, and pledged and delivered the bill of lading, indorsed in blank by Bishop C. Perkins Company per Bishop C. Perkins, to the bank as collateral security for the loan. Immediately afterwards the bank returned the bill of lading to Bishop C. Perkins, taking a trust receipt for the bill of lading, in order that he might handle the shipment, either by selling the sugar and accounting to the bank for the price, or by storing the sugar in a warehouse and delivering the warehouse receipt to the bank. On the same day Perkins wrote to the Central Warehouse & Forwarding Company, at Houston, that the bill of lading would be sent direct to the Central Warehouse & Forwarding Company, and he instructed the company to store the sugar in the company's warehouse and issue a negotiable warehouse receipt for the same and to deliver the receipt to the Lumbermen's National Bank with instructions to notify the Whitney Central National Bank of New Orleans that the warehouse receipt was held for the latter's order. On the next day Per-

kins sent the bill of lading by registered mail to the Central Warehouse & Forwarding Company, but it appears that it was not delivered until three or four days later. There is no explanation as to why Perkins instructed the Central Warehouse & Distributing Company to have the warehouse receipt held in the Houston bank subject to the order of the Whitney Central National Bank, instead of having it held subject to the order of the Canal-Commercial Trust & Savings Bank; but the probability is that that was an honest mistake on Perkins' part, because, on the same day that he mailed the bill of lading to the Central Warehouse & Forwarding Company, he wired the company to send the warehouse receipt for the sugar to him instead of placing it in the bank at Houston.

Four days after the pledge of the bill of lading to the bank and its return to Perkins on the trust receipt, it developed that Bishop C. Perkins Company was insolvent; and the manager of the International Trading & Rice Company called upon Perkins, in New Orleans, and demanded that he pay for the sugar or surrender the bill of lading. As Perkins could neither pay the invoice nor produce the bill of lading, the International Trading & Rice Company, as seller of the sugar, notified the railroad company to stop the shipment in transit because of the insolvency of Bishop C. Perkins Company and because of the right of the shipper to rescind the sale for nonpayment of the price. On the next day the shipment arrived in Houston, and on the same day the Central Warehouse & Forwarding Company received the bill of lading by registered mail from Perkins. The railway company refused to deliver the shipment to the Central Warehouse & Forwarding Company on the company's offer to surrender the bill of lading, but delivered it to the International Trading & Rice Company on the company's furnishing an indemnity bond, with satisfactory surety, to protect the railway company "against any claim that

might arise from the stoppage of said shipment in transit by the seller or for nondelivery in accordance with the original bill of lading issued on said shipment," etc.

In the meantime, as soon as it had become known that Bishop C. Perkins Company was in financial difficulties, the Canal-Commercial Trust & Savings bank had demanded of Perkins, in New Orleans, that he return the bill of lading or pay the note which it was pledged to secure. Perkins had been informed of the stoppage of the shipment in transit and had wired the Central Warehouse & Forwarding Company to return the bill of lading to him, and on the same day that the bank demanded its return he received it by mail from the Central Warehouse & Forwarding Company and immediately returned it to the bank and took back his trust receipt. . That was on the seventh or eighth day after he had pledged the bill of lading to the bank and had retaken it on the trust receipt. The bill of lading was in Perkins' possession, or in the possession of the Central Warehouse & Forwarding Company for him, when the shipment was stopped in transit and delivered to the seller, the International Trading & Rice Company, on the indemnity bond.

The Canal-Commercial Trust & Savings Bank, having regained possession of the bill of lading from Perkins, made demand on the railway company for the shipment or its value. The reply being that the shipment had been stopped in transit and delivered to the seller on the latter's indemnity bond, the bank brought this suit against the railway company for $4,800, as the value of the sugar, with legal interest from the day when the shipment arrived in Houston, and for $50 statutory damages allowed by the Act 29 of 1908. The railway company defended on the ground that the bill of lading was in the possession of the consignee, Bishop C. Perkins Company, and . therefore not pledged to the bank, when the shipment was stopped in transit and delivered to the seller. The railway company called the International Trading & Rice Company in warranty to defend the suit, and the latter pleaded that the return of the bill of lading by the pledgee, bank, to the pledgor, Bishop C. Perkins Company, on the latter's trust receipt, had the effect of annulling the pledge, and that therefore the bank had no claim upon the sugar when it was stopped in transit and taken by the seller for nonpayment of the price and because of the insolvency of the consignee. The court gave the plaintiff a judgment for $4,625, as the value of the sugar, with interest as prayed for, and gave the railway company a judgment against the warrantor for the same amount. The railway company and the warrantor have appealed.

[1, 2] As the shipment was an interstate shipment, the obligations of the carrier are determined by the federal statute relating to bills of lading in interstate and foreign commerce, Act of August 29, 1916, c. 415, 39 Stat. at L. 538 (U. S. Comp. St. § 8604aaa et seq.). The uniform state statute on the subject, Act 94 of 1912, p. 101, is substantially and almost exactly like the federal statute. The most pertinent provision of the federal statute is section 39 (which is section 42 of the state statute), viz.:

"That where an order bill has been issued for goods no seller's lien or right of stoppage in transitu shall defeat the rights of any purchaser for value in good faith to whom such bill has been negotiated, whether such negotiation be prior or subsequent to the notification to the carrier who issued such bill of the seller's claim to a lien or right of stoppage in transitu. Nor shall the carrier be obliged to deliver or justified in delivering the goods to an unpaid seller unless such bill is first surrendered for cancellation." (Stat. at L. 544.)

The only difference in the language of section 42 of the state statute is that it begins thus, "Where a negotiable bill has been issued," whereas, the federal statute says: "That where an order bill has been issued," etc. It is conceded by the appellants that,

according to the language quoted, if the pledge of the bill of lading to the bank by Bishop C. Perkins Company was not annulled by the temporary return of the bill by the bank to the pledgor on the trust receipt, the railway company is liable to the bank for having delivered the sugar to the unpaid seller without a surrender of the bill of lading for cancellation. There is nothing in either the federal or the state statute, of course, relating to the question whether the temporary return of the bill of lading by the pledgee to the pledgor had the effect of annulling the pledge. The appellants rely upon article 3162 of the Civil Code, viz.:

"In no case does this privilege [meaning the privilege of the pledgee] subsist on the pledge except when the thing pledged, if it be a corporeal movable or the evidence of the credit if it be a note or other instrument under private signature, has been actually put and remained in the possession of the creditor, or of a third person agreed on by the parties."

The article has been construed to mean that, if the thing pledged, whether it be a negotiable instrument or something else, "has been actually put" in the possession of the pledgee, a constructive possession thereafter will suffice to keep the pledge in force, and that a temporary return of the thing to the pledgor in trust or as the agent of the pledgee will not destroy the contract of pledge, even with regard to creditors of the pledgor, excepting, of course, those who deal with him on the strength of his having the thing in his possession, as in Geddes v. Bennett, 6 La. Ann. 516. See Conger v. City of New Orleans, 32 La. Ann. 1250; Weems v. Delta Moss Co., 33 La. Ann. 976; Forstall v. Consolidated Association, 34 La. Ann. 776; Jacquet v. His Creditors, 38 La. Ann. 863; Succession of Lanaux, 46 La. Ann. 1036, 15 So. 708, 25 L. R. A. 577; Britton & Koontz v. Harvey, 47 La. Ann. 259, 16 So. 747; Clark v. Iselin, 21 Wall. (88 U. S.) 360, 22 L. Ed. 568. In Conger's Case, supra, Chief Justice Bermudez, for the court, said:

161 LA.—34

"Possession, though essential to the validity of the pledge, need not be always in the creditor. It is sufficient that the thing pledged be in the possession of one occupying ad hoc the position of a trustee. The debtor himself may, in some cases, be considered as such trustee and be given possession of the thing by him pledged, provided his tenure be precarious and clearly for account of the creditor. The Louisiana doctrine is in perfect accord with both the common, the Roman and French laws. R. C. C. 3162; C. N. 2076; Clark v. Iselin, 21 Wall. (U. S.) 360, 22 L. Ed. 568; 5 Bing. N. C. 136; Ten Eick v. Simpson, 1 Sandf. [Ch.] (N. Y.) 248; Cook v. Darling, 2 Pick. (Mass.) 607; Jarvis v. Rogers, 15 Mass. 389; 2 Taunt. 266; Story on Bailments, 299; Macomber v. Parker, 14 Pick. (Mass.) 497; * * * Casey v. Cavaroc, 96 U. S. 476, 24 L. Ed. 779—in which the above authorities were reviewed, analyzed and applied.

In Jacquet v. His Creditors, supra, the things pledged were placed in the care and possession of an employee of the pledgors and they were allowed to use the pledged articles in their manufacturing business. The court said:

"We do not think, however, that these facts derogated from the validity of the pledge. The possession of the property by the pledgee, as shown, was sufficient. C. C. 3162; Weems v. Moss Co., 33 La. Ann. 973. In fact, the property pledged may be left in the possession of the debtor himself, provided his possession is precarious and clearly for account of the creditor. Conger v. City, 32 La. Ann. 1250."

The doctrine is stated in Clark v. Iselin, supra, thus:

"Where promissory notes are pledged by a debtor to secure a debt, the pledgee acquires a special property in them. That property is not lost by their being redelivered to the pledgor to enable him to collect them; the principal debt being still unpaid. Money which he may collect upon them is the specific property of the creditor."

It is true that in Citizens' Bank v. Janin, 46 La. Ann. 995, 15 So. 471, the author of the opinion referred to the rulings in Conger v. City of New Orleans, Weems v. Delta Moss Co., and Jacquet v. His Creditors, supra, as if they were not authority for the doctrine that after the pledged property has been ac-

tually delivered to the pledgee it may be returned to the pledgor temporarily, as trustee for the pledgor, without annulling the pledge, even with regard to creditors of the pledgor, except, of course, those who deal with the pledgor on the faith of his having possession of the property. But the criticism of the rulings in those cases was not at all appropriate or called for in the decision of Citizens' Bank v. Janin. In that case the pledge claimed by the Third National Bank of New York, which was made in the form of a chattel mortgage, at a time when chattel mortgages were not allowed or recognized in Louisiana, was disallowed in so far as it conflicted with the claim of a seizing creditor who had dealt with the pledgor on the strength of his having possession of the property, a dredge boat, which had never been in the possession of the New York bank, claiming to be the pledgee. Besides, the rulings in Conger v. City, Weems v. Delta Moss Co., and Jacquet v. His Creditors were afterwards quoted with approval in Succession of Lanaux, supra, and in Britton & Koontz v. Harvey, supra.

An interesting discussion of the subject is to be found in Casey v. Cavaroc, 96 U. S. 467, 24 L. Ed. 779. In that case the New Orleans National Banking Association agreed to pledge certain promissory notes and other securities to the Société Credit Mobilier, of Paris, France, to secure its acceptances of bills drawn by the New Orleans bank to the amount of 1,000,000 francs. The agreement was that the New Orleans bank would deposit the securities with Cavaroc & Son, of New Orleans, as trustee for the Credit Mobilier, but the securities were never delivered to Cavaroc & Son until the bank failed, when Charles Cavaroc, who was president of the bank, delivered the securities to Cavaroc & Son to protect the credit Mobilier. The court sustained the contention of the receiver of the insolvent bank that the securities were delivered to Cavaroc & Son in contemplation of the insolvency of the bank, not by way of pledge, but to give an unfair preference to Cavaroc & Son and to the Credit Mobilier over other creditors of the insolvent bank, contrary to the provisions of the Banking Act. In the course of his opinion, Justice Bradley, for the court, laid great stress upon the fact that, although the negotiable instruments that were intended to be pledged were placed in an envelope in which they alone were kept for the pledgee, they were not indorsed, but were payable to the order of the New Orleans Bank. It was said that the possession of unindorsed commercial paper, held by a pledgee, gave the latter only a lien on the pledged securities, whereas such possession of indorsed commercial paper gave a title to the securities. It was said that, if the New Orleans Bank had actually delivered the securities to Cavaroc & Son, as the agent or trustee for the Credit Mobilier, the bank's having possession of the securities afterwards, for the purpose of collecting them, or of taking renewals or substitutions, for account of the pledgee, would not have annulled the pledge. The court reviewed the decisions in other states and in France, and expressed the conclusion that, under the law of France and of Louisiana, as well as at common law, pledged property might be returned temporarily to the pledgor, in trust for the pledgee—especially if the property be of such character that it is more convenient for the pledgor than for the pledgee to realize upon it—without annulling the pledge, even with regard to other creditors of the pledgor, except, of course, those dealing with him on the strength of his having possession of the property. The following excerpts from the opinion in the case are very pertinent, viz.:

"No entry was made on the books of the bank of this transaction with the Credit Mobilier, except that the bills drawn on it were duly entered amongst bills payable, and the Credit Mobilier was credited with the amount,

which was put down amongst the liabilities of the bank, and so appeared in all the monthly statements, beginning with the 1st of August. The pledge of securities was not noticed. These all remained on the portfolio of bills discounted, as before, and their amount continued to be represented in the daily and monthly statements, without any note or memorandum to show that they had been pledged. So far as the public, and those with whom the bank dealt, could perceive, the bank continued to have possession and control of all the securities in its own right, and they all appeared to be equally liable with the other assets to the claims of all the creditors. * * *

"The case has some features in common with, though differing in others from, that of Clark v. Iselin, 21 Wall. 360 [22 L. Ed. 568], in which this court held that collateral securities transferred by the borrower to the lender at the time of the loan were not devested out of the latter by the mere fact of his depositing them with the borrower for collection. The court say: 'Obviously this deposit in no degree affected the title of the defendants to the notes. It merely facilitated collections.' The court then cited White v. Platt, a New York case, in 5 Denio, 269, in which it was said: 'Where promissory notes are pledged by a debtor to secure a debt, the pledgee acquires a special property in them. That property is not lost by their being redelivered to the pledgor to enable him to collect them; the principal debt being still unpaid. Money which he may collect upon them is the specific property of the creditor. It is deemed collected by the debtor in a fiduciary capacity.'

"The case of Clark v. Iselin, being a New York case, and governed by New York law, or the common law as understood in New York, the authority cited was necessarily of great weight, if not controlling. When, as in that case, the title has been transferred to the creditor, and the collections are made for his benefit, the pledgor merely acting as his servant or agent in making them, the character of the security is not affected at the common law by the debtor having actual possession of the collaterals; there being no fraud in the transaction. * * *

"This advantage exists when notes and bills are transferred to a creditor by way of collateral security. His possession of them gives them the character of a pledge. Their indorsement if payable to order, or their delivery if payable to bearer, gives him the title also, which is something more than a pledge. This double title existed in White v. Platt and in Clark v. Iselin. Hence the actual possession

of the securities by the creditor was a matter of less importance in those cases. * * *

"In Hays v. Riddle, 1 Sandf. [N. Y.] 248, the plaintiff delivered to the defendant, at his request, a convertible bond of the New York & Erie Railroad Company (which had been pledged by the latter to the former), in order to get it exchanged for stock of the same company, which stock was to be returned and substituted for the bond in pledge. The defendant never returned either the bond or the stock. The plaintiff brought an action of trover against him for the bond, and recovered its value, being less than the debt for which it was pledged. It being objected that by delivering back the bond to the pledgor the plaintiff had lost his special property in it as pledgee, the court said: 'At common law, as a general rule, the positive delivery back of the possession of the thing, with the consent of the pledgee, terminates his title. Homes v. Crane, 2 Pick. [Mass.] 607; Jarvis v. Rogers, 15 Mass. 389. If the thing, however, is delivered back to the owner for a temporary purpose only, and it is agreed to be redelivered by him, the pledgee may recover it against the owner, if he refuse to restore it to the pledgee, after the purpose is fulfilled. Skarratt v. Vaughan, 2 Taunt. 266; Story, Bailm. § 299. So, if it be delivered back to the owner in a new character, as, for example, as a special bailee or agent, in such case, the pledgee will still be entitled to the pledge, not only as against the owner, but also as against third persons. [Macomber v. Parker] 14 Pick. [Mass.] 497.' * * *

"The civil law, which is more particularly our guide in the present case, is to the same general effect, though it is more careful in denouncing the danger of losing the right of pledge by parting with anything like permanent or continued possession to the pledgor, and it preserves very clearly the distinction between pledge and hypothecation or mortgage. * * *

"The securities claimed to have been pledged to the Credit Mobilier remained in the possession and control of the bank until the time of its failure. Up to that period they were not in such a condition as the law requires for a pledge. The placing them in such a condition afterwards, by Cavaroc's removing them from the bank at the time of its failure, was, in fact, an attempt to create a pledge then, by assuming the possession requisite thereto, and a pledge taking its origin at that time was a preference forbidden by the Banking Act.

"It must not be overlooked that the Credit Mobilier has no other claim to the securities in question but that of pledge. A pledge and possession, which is its essential ingredient, must

be made out, or their privilege fails. An agreement for a pledge raises no privilege. There is no mortgage, for the title of the securities was never transferred to them. The evidence of the cashier is that they were all stamped payable to the order of the bank when discounted. They were not indorsed by the cashier until the day they were removed by Cavaroc, which was after the bank had failed. * * *

"These considerations also supply an answer to another suggestion, that equity will consider as done what the parties intended should be done, which it is assumed was, in this case, a transfer of the title of the securities. Equity will not exercise this power when it would injure third persons who have incurred detriment, and acquired consequent rights by the acts that are done. Such detriment has, in view of the law, been incurred in this case, and such rights have, by the express letter of the law, accrued.

"This suggestion may also be answered by the fact that it cannot be truly said to have been the intent of the parties to transfer the title. The agreement was only that 'securities of the first class shall be deposited with the firm of Messrs. Cavaroc & Son.' A transfer of the title would have been inconsistent with that unrestricted control over the securities which the bank desired to, and did, retain, and which must be considered as having been assented to by the Credit Mobilier, through the common agent, Cavaroc.

"On this ground, therefore, of want of possession in the pledgee, or of a third person agreed upon by the parties, and of actual possession and control in the pledgor, we feel compelled to hold that the Credit Mobilier had no privilege as to third persons, and that the receiver was entitled to the securities in question." * * *

The decision in Commercial National Bank of New Orleans v. Canal-Louisiana Bank & Trust Co., 239 U. S. 520, 36 S. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917E, 25, is directly in point, viz.:

"A pledgee of bills of lading for cotton, who permits the pledgor to withdraw such bills of lading under an agreement to hold for the pledgee's account, and thus enables the pledgors to obtain negotiable warehouse receipts, which they pledge to a bank as security for their notes, cannot question the title of the latter, having clothed the pledgor with the indicia of ownership, within the meaning of the doctrine established by the Uniform Warehouse Receipts Act (La. Acts 1908, No. 221, §§ 40, 41,

47), that, if the owner of goods permits another to have possession or custody of negotiable warehouse receipts running to the order of the latter or to bearer, it is a representation of title upon which bona fide negotiators for value are entitled to rely, despite breaches of trust or violations of agreement on the part of the apparent owner. * * *

"The rights of a pledgee of warehouse receipts under the Uniform Warehouse Receipts Act (La. Acts 1908, No. 221, §§ 40, 41, 47), as a bona fide purchaser, where the pledgors had been clothed with apparent ownership by the real owner, are not lost by permitting the pledgors to withdraw such receipts under an agreement to hold for the pledgee's account where this did not result in a subsequent negotiation of them to a purchaser in good faith for value."

The appellants in this case stopped the shipment in transit and delivered it to the shipper, not on the strength but in spite of the consignee's having possession of the bill of lading. If the appellants had, in good faith, dealt with Bishop C. Perkins as the holder and apparent owner of the bill of lading, their case would be different. Or, if Perkins had negotiated the bill of lading, although he would have been guilty of a crime for violating the trust, the plaintiff in this case would have to stand the loss, according to two sections of the statute, sections 30 and 37 of the federal statute (being, respectively, sections 31 and 38 of the state statute), viz.:

"Sec. 30. That an order bill may be negotiated by any person in possession of the same, however such possession may have been acquired, if by the terms of the bill the carrier undertakes to deliver the goods to the order of such person, or if at the time of negotiation the bill is in such form that it may be negotiated by delivery." (39 Stat. at L. 543.)

"Sec. 37. That the validity of the negotiation of a bill is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the bill was deprived of the possession of the same by fraud, accident, mistake, duress, loss, theft, or conversion, if the person to whom the bill was negotiated, or a person to whom the bill was subsequently negotiated, gave value therefor in

good faith, without notice of the breach of duty, or fraud, accident, mistake, duress. loss, theft, or conversion." (39 Stat. at L. 544.)

[3] It cannot be disputed that a person who withdraws, on a trust receipt, collateral securities which he has pledged to secure a debt, holds the securities in a fiduciary capacity, as trustee, for account of the pledgee. That is virtually declared by the Act 120 of 1910, p. 192, declaring that any customer of any bank or banker, who is allowed to withdraw, on a trust receipt, collateral securities pledged by him, and who sells or otherwise disposes of the securities for any other purpose than to pay his indebtedness for which they were pledged, or who fails to return the securities on demand or to pay the value of them, shall be guilty of a felony and be subject to imprisonment at hard labor for a term not less than 2 nor more than 10 years. The improper use of pledged securities, by the pledgor holding them under a trust receipt, is a species of embezzlement.

When a pledgee of negotiable securities, holding them as collateral security for the pledgor's debt, returns them to the pledgor temporarily, on a trust receipt, he takes the risk only that third persons may, in good faith, and to his prejudice, deal with the holder as the apparent owner of the securities, but he does not thereby forfeit the pledge to other creditors of the pledgor.

Appellants contend that the amount of the judgment exceeds the value of the sugar at the time when it arrived in Houston and should have been delivered by the carrier. According to our calculation, the judgment is for $2 less than the value of the sugar, plus the statutory penalty of $50. At any rate the judgment is approximately correct, considering that the market quotations varied slightly from day to day from the date when the sugar should have been delivered to the date when it was returned to the seller.

The judgment is affirmed at appellant's cost.