ODOM, Justice.
 

 On December 19, 1932, the Orleans Homestead Association executed a negotiable promissory note for $30,000, due in 90 days, payable to the Canal Bank & Trust Company, and delivered it to the bank. The consideration for the note was money borrowed. By payments or agreements be-’ tween the parties, the amount now due on the note is $7,085.23.
 

 On December 23, 4 days after the note was executed and delivered, the bank delivered it in pledge, along with other collateral, to the Reconstruction Finance Corporation (hereinafter referred to as R F C) as security for a loan. On March 6, 1933, about 14 days before the note fell due, the Canal Bank & Trust Company was closed under United States Treasury Regulations and a Presidential Proclamation. It was not allowed to reopen until March 20, and then on a restricted basis, the result being that 95 per cent, of all deposits then in the bank was “frozen,” no depositor being allowed under federal regulations to withdraw more than 5 per cent, of his deposit.
 

 At the time the bank was closed on March 6 and when it was permitted to reopen on a'restricted basis on March 20, the Plomestead Association had on deposit in the bank a sufficient sum to pay the note and all interest thereon. The note fell due on March 20, 1933, the day on which the bank reopened on a restricted basis', and on that day the secretary of the Orleans Homestead Association called at the bank to discuss payment of the note out of its deposit. Seven days later the secretary of the association requested the bank to apply its frozen deposit to the payment of its note, and on April 28, The Homestead Association tendered its checks drawn on the bank sufficient in amount to pay the loan. The bank refused to permit payment of the
 
 *369
 
 note out of the frozen deposit, on the ground that the note was then held in pledge by the RFC, a third person.
 

 'On May 20, 1933, the Canal Bank & Trust Company was taken over for liquidation by the Louisiana State Banking Commissioner and was, on the day this suit was filed, and is now, in process of liquidation. The Orleans Homestead Association intervened in the liquidation proceedings, the purpose of the intervention being to obtain a decree ordering the bank “in liquidation to set off the frozen balance of $7,085.23 on deposit in said Canal Bank & Trust Company in the name of the Orleans Homestead Association against the balance due on the note dated December 19th, 1932, and due March 20th, 1933, as of the due date of said note March 19th or 20th, 1933 and that said note be returned to the Orleans Homestead Association marked ‘Paid and cancelled’ together with all collateral securing said note.”
 

 By amended and supplemental petition, the RFC was made a party defendant. In this petition intervener alleged that the R F C did not acquire the note in pledge until May 20, 1933, two months after the note fell due.
 

 Answers were filed by the liquidator of the bank and the R F .C, in which they set up substantially the facts as stated above,, and, in addition, expressly averred that the note was pledged by the bank long before it became due; that the RFC was a holder of it in due course and that therefore intervener was cut off from claiming the benefit of those equities, that is, the benefit of set-off, which it could have claimed against the bank had the note not gone into the hands of an innocent holder for value before maturity. Intervener’s demand was rejected by the trial court, and this appeal followed.
 

 The identical situation here presented and the same pleas and defenses here made were presented and made in the case of In re Liquidation Canal Bank & Trust Co., Intervention of Gay-Sullivan Co., 182 La. 421, 162 So. 31, 102 A.L.R. 1091, except that in the present case it is conceded that the note involved is a negotiable instrument.
 

 Under our holding in the Gay-Sullivan Case, intervener’s demands must be rejected unless it is true, as intervener alleged and now contends, that the note went into the hands of the RFC after maturity.
 

 Counsel for intervener says that the Canal Bank & Trust Company owned the note when it fell due on March 20, 1933, and owned it on April 28, when intervener tendered its checks drawn on the bank for the amount of its debt. Even if it did, that fact does not help plaintiff’s cause.
 

 Counsel argues that because the bank owned the note, compensation took place and that intervener is entitled to plead set-off, and cites the Wainer Case reported in 178 La. 961, 152 So. 578, and First National Bank of Ruston v. Canal Bank & Trust Co., 181 La. 445, 159 So. 711, in support of his theory. In those cases it was held that a depositor was entitled to offset his debts to the bank with his frozen deposit. But neither of those cases has any application
 
 *371
 
 here, because in the Wainer Case the rights of a third person were not involved, and in the Bank of Ruston Case, while the RFC became the holder of the participation certificates before their maturity dates, these certificates were nonnegotiable, for which reason the Bank of Ruston was entitled to plead all such equities against the P. F Cas it had against the Canal Bank & Trust Company.
 

 In the present case the note involved is a negotiable instrument. But if it was pledged after maturity, the RFC is not a holder in due course and is entitled to no more consideration than would have been due the bank had the note not been negotiated. That is conceded by all parties.
 

 This brings us to the question whether the note was pledged after maturity. It is not disputed that the note was •pledged originally by the Canal Bank & Trust Company to the RFC before its maturity. But counsel for intervener contends that it went back into the hands of the Canal Bank & Trust Company and was again pledged on May 20, 1933, when it was overdue. The proof administered •does not support that contention.
 

 The Orleans Homestead Association, intervener, first became indebted unto the '.bank in June, 1932, and to evidence that in•debtedness, executed its note payable to the bank. That note was dated June 20 and •matured on September 20. Not being able •to pay the note at maturity, the Homestead Association executed another note of like amount and tenor, dated September
 
 20
 
 and maturing December 20. This note was not paid, and on December 19 a like note was executed to take up the one which matured on the 20th. The last note mentioned matured on March 20, 1933. This is the note here involved.
 

 In April, 1932, the Canal Bank & Trust Company applied to the RFC for a loan of $3,600,000, whidi was granted, the amount to be disbursed as, if, and when the bank delivered collateral to secure the amounts advanced. On July 19, 1932, the RFC disbursed to the bank $490,576, and to secure that advance the bank pledged certain collateral, including the note of the Orleans Homestead Association dated June 20 and maturing September 20, 1932. From April 21, 1932, when the bank obtained the first loan from the R F C, on down to May 20, 1933, the bank was at all times heavily indebted unto that concern. When intervener’s first note to the bank fell due on September 20, 1932, it was in the hands of the R F C as pledgee, and in order that it might be paid or renewed, pledgee delivered it to the bank on a trust receipt or certificate. The note was not paid but renewed, and the renewal note was delivered to the pledgee in the place and stead of the first one. When the second note matured on December 20, 1932, pledgee delivered it to the bank on a trust receipt, and when it was renewed by» the one dated December 19, 1932, the new note was likewise delivered to the pledgee: That was on December 23, 1932, four days after the note was executed and long before its maturity. Thereafter this note remained constantly in the hands of the pledgee until April 1, 1933, when it went back into the physical possession of the bank. But
 
 *373
 
 it went back to the bank on a trust receipt for servicing or collection. Counsel contend that inasmuch as the bank was then owner of the note and had on deposit sufficient funds of the intervener’s to pay it, it being then overdue, compensation necessarily took place. That would be true if the pledgee, in surrendering the note, had relinquished its rights as pledgee. But it did not. The bank issued a receipt for the note, agreeing “to hold this paper in trust for the Reconstruction Finance Corporation separate and distinct from our own assets, and agree promptly to present for payment, and if it is not paid, protest it unless otherwise instructed by the custodian Bank, and not to surrender the paper or accept any extensions or renewal thereof without authority from the Reconstruction Finance Corporation, and agree to keep the proceeds thereof when collected separate and distinct from our own assets, remitting the proceeds of the paper collected immediately upon receipt to the cus-todian Bank and to notify it immediately in the event the paper is not paid on presentation.”
 

 Clearly, the RFC did not, by temporarily surrendering the note to the payee bank for collection on this trust receipt, annul the pledge or lose its lien on the thing pledged. Canal-Commercial Trust & Savings Bank v. Railroad Company, 161 La. 1051, 109 So. 834, 49 A.L.R. 274; Casey v. Cavarock, 96 U.S. 467, 24 L.Ed. 779.
 

 After the due date of the note, the bank was taken over by the banking commissioner for liquidation. Application was made to the RFC for a loan of about $13,000,000, this amount to be used for the double purpose of taking up all notes given by the bank for previous loans and to secure funds with which to make a substantial payment to the bank’s depositors. The application was approved by the RFC on condition that all the assets of the bank be pledged as security for the loan and that it continue to hold in pledge all collateral previously pledged, and on further condition that inasmuch as the bank was then in liquidation, the transaction be approved by the court. Judge Cage, who heard and decided the present case, gave his approval on May 20, 1933. The loan was made and the pledge agreement carried out. The note involved was listed along with other collateral then held in pledge by the RFC.
 

 This gives rise to counsel’s contention that the pledge of this note dates from May 20, 1933, for he says in his brief on page 15:
 

 “This note had been due since March 20, 1933, and therefore the pledge made on May 20, 1933, was of an instrument that was more than 60 days overdue.”
 

 Counsel seems to have overlooked the fact that the transaction of May 20, 1933, did not involve a new pledge of the collateral held by the R F C as security for the old loans. The debts previously owed by the bank to the RFC were merged into a new and larger one, the agreement being that as security for the new loan all the collateral previously pledged to secure the old ones should remain pledged. It then had physical possession of this pledged note, which never went back into the hands
 
 *375
 
 of the' bank. By these transactions the R F C lost none of its rights as pledgee of the note. See Reconstruction Finance Corporation v. Thomson et al., 186 La. 1, 171 So. 553, decided Monday, November 30, 1936.
 

 Immediately following this transaction between the liquidator of the Canal Bank and the R F C on May 20, the latter sold this note and other collateral to the National Bank of Commerce of New Orleans, under an agreement which reads in part as follows:
 

 “2. The Corporation (the R. F. C.) agrees that the New Bank (The National Bank of Commerce) shall have the right at any time and from time to time within two years from the date hereof to exchange and re-exchange any assets purchased or otherwise acquired by the New Bank hereunder whether or not payment on account has been made (by delivery of such assets to the Corporation or to any party designated by the Corporation) for like value of assets, other than cash, selected by the New Bank from the Assets at the time held by the Corporation to secure any indebtedness of the Old Bank and/or the State Bank Commissioner and the liquidator of the Old Bank. Such exchanges and re-exchanges shall be made on the valuation basis specified in Paragraph 3 hereof.”
 

 Subsequently the purchaser surrendered the note to the RFC and selected in its stead state highway bonds. It is argued that the National Bank of Commerce was not a holder of the note in due course because it was overdue when the transfer was made, and that for the same reason the RFC was not a holder in due course when it reacquired it.
 

 We find no merit in this argument. The RFC was unquestionably a holder of the note in due course on May 20, when the transfer was made. The legal effect of the delivery of the note in pledge before maturity by the original holder to the RFC was to cut off all equities which may have existed between the maker and the bank. Negotiable Instruments Law, section 57, Act No. 64 of 1904. And section 58 of that act says that “a holder who derives his title through a holder in due course, and who is not himself a party to any fraud or illegality affecting the instrument, has all the rights of such former holder in respect of all parties prior to the latter.” Therefore, the National Bank of Commerce, having derived its title from a holder in due course and not having been a party to any fraud or illegality affecting the note, was vested with good title, the same title which the RFC had, and being vested with perfect title, could transfer the note back to the R F C or transfer it to any one élse, conveying such title as it had. Furman v. George, 169 La. 978, 126 So. 444.
 

 When the original holder of a negotiable instrument puts it into the hands of an innocent third holder for value before maturity, whether by sale or pledge, it thenceforth travels in commerce without luggage.
 

 Judgment ’ affirmed.
 

 ROGERS, J., absent