In re PUSEY–MAYNES–BREISH CO.

No. 19421.

District Court, E. D. Pennsylvania.

March 3, 1941.

Hugh D. Scott, Jr., Howard S. Spering, and Percival H. Granger, all of Philadelphia, Pa., for trustee in bankruptcy.

Murdoch K. Goodwin and Arthur Littleton, both of Philadelphia, Pa. (Morgan, Lewis & Bockius, of Philadelphia, Pa., of counsel), for petitioner.

KALODNER, District Judge.

The "law's delays" are strikingly and most unhappily apparent in the case at issue.

Pusey-Maynes-Breish Company, a corporation, was adjudicated bankrupt on August 13, 1936. The referee to whom the matter was referred held ten hearings, drawn out over almost a year, commencing February 8, 1937, and terminating January 24, 1938. The referee then permitted two and one-half years to elapse before making any disposition of the matter. It was not until June 15, 1940, that he made his order. No explanation is apparent for the delay in the referee's disposition.

Reasonable promptness in disposition is one of the essences of justice. Public policy, too, is thwarted by procrastination, so glaringly apparent in this matter.

A reading of the record, which comprised 481 typewritten pages, in addition to 115 pages of exhibits, sustains the contention of the petitioner for review that it should have been possible for the parties to have stipulated the facts, or at least all but a few controverted items.

I have been compelled to spend more than 100 hours in the review and analysis of the bulky record, since the petition for review is premised on the contention that the referee erred in his conclusions of law as well as in his findings of fact.

The following facts are undisputed:

The Pusey-Maynes-Breish Company was engaged in business in Philadelphia, Pennsylvania, as a slaughter-house, and was duly adjudicated a bankrupt on August 13, 1936.

The proceedings were referred to L. Leroy Deininger as referee, and shortly thereafter John P. Herr was elected trustee of the bankrupt estate.

On January 6, 1937, the trustee filed a petition praying for an order on the Philadelphia National Bank to show cause why it should not turn over to the trustee the sum of $17,659.12, representing proceeds of certain accounts receivable which had been assigned by the bankrupt company to the bank.

Pursuant to this petition, the referee held the hearings above referred to, which terminated January 24, 1938, and on June 15, 1940, made an order on the bank to turn over to the trustee in bankruptcy all of the assigned accounts and the proceeds thereof.

Prior to March, 1935, the bankrupt had been indebted to the Philadelphia National Bank in the sum of $20,000. The loan was unsecured. The $20,000 indebtedness had existed from June 30, 1932, and was carried on a renewal basis until March 6, 1935, at which time it was renewed by another note for $20,000 still unsecured.

On March 12, 1935, the unsecured note for $20,000 was paid off by the substitution of a new collateral demand note in the same amount, secured by the assignment of accounts receivable of the bankrupt company totalling $21,995.25. The new note was actually "put on" by the bank on March 18, 1935. The intervening days between March 12 and March 18 were utilized to arrange for the deposit with the bank of the $21,995.25 accounts receivable of the bankrupt as collateral.

On May 3, 1935, the bankrupt company and the bank executed a loan agreement which specified the practice to be followed with respect to the assigned accounts receivable. Parenthetically it may be stated that between March 12, 1935, and May 3, 1935, the accounts were handled in the same manner in which they were subse-

quently handled under the agreement of May 3, 1935.

The May 3 loan agreement contained the following pertinent provisions:

That the bankrupt should make suitable endorsement on its books disclosing the assignment of the accounts to the bank.

That with respect to the original and subsequently pledged accounts receivable, duplicate and triplicate invoices were to be delivered by the bankrupt to the bank. The duplicate invoice was to be marked: "For value received we hereby sell, assign, transfer and set over this account to the Philadelphia National Bank, Philadelphia, Pennsylvania." The triplicate invoice was to be marked: "This account has been assigned to the Philadelphia National Bank, 1416 Chestnut Street, Philadelphia, Pennsylvania, to whom remittance should be made. Payment to any other party will be at your risk."

That unless otherwise desired by the bank, the bank was not to notify debtors of the assignment of their accounts, and that bankrupt should be permitted to collect the said accounts directly from the debtors. The privilege of collection was to terminate automatically upon the appointment of a receiver or bankruptcy proceedings.

That the bankrupt company should report to the bank daily, or as often as collections were made, all payments which had been received in liquidation of the accounts which had been assigned; the bankrupt simultaneously to deliver to the bank all cash, checks, etc., received in payment; said remittances to be deposited not in the general checking account of the bankrupt, but in a special account entitled "Pusey-Maynes-Breish Company, Inc., Account Number Two."

That account number two was to be designated as a trust fund, appropriated exclusively to the security for the debt, and as payment for future obligations of the bankrupt company to the bank.

That no withdrawals could be made from account number two except by check countersigned by an employee of the bank.

That if the company had new accounts which were satisfactory to the bank as security, it could offer to the bank an assignment of the new accounts in substitution for the release of monies on deposit in the special account, and that "after" the assignment of the new accounts had been made the bankrupt would be entitled to receive cash from the special account.

That all such new or substituted accounts receivable and their proceeds were to become subject to the agreement of May 3, 1935, as if originally assigned to the bank.

That as to returned merchandise covering which an account had been assigned, the bank was given a lien on said merchandise with the right to sell it.

There is no dispute that account number two as set up by the agreement of May 3, 1935, was intended to provide for a revolving fund in order that the bank would at all times be secured and the company could continue its operations.

The collateral demand note which was signed by the borrower recited that certain accounts receivable had been assigned as collateral security for the loan and that such security "and any heretofore or which may hereafter be deposited with said bank * * * shall be applicable to secure the payment of this or any past or any future obligation or liability of maker to said bank; and all such property and all securities so deposited and held at any time shall stand as one general continuing collateral security for the whole or any part of maker's obligations or liabilities to said bank."

The note provided that in the event of the bankruptcy of the borrower the note should become immediately payable and further "that said bank shall have a lien upon all funds, monies, balances, stocks, bonds, notes and other property, real or personal, at any time in its possession belonging to the maker, for the payment of this note and any other of maker's obligations to said bank, matured or unmatured, or that may be hereafter contracted; and all such funds, monies or balances shall immediately become the subject of set-off and may be appropriated and applied against any such debt or obligation of maker to said bank * * *."

When the bankruptcy intervened, the bank held 131 accounts receivable by way of assignment, with a total face value of $20,514.40, and the balance on deposit in account number two was $4,854.01—a total of $25,368.41. With the exception of 14 accounts totalling $427.63, all of the 131 accounts had been assigned to the bank during a period of four months immediately preceding the filing of the bankruptcy petition. The amount of the bankrupt's in-

debtedness to the bank proved in bankruptcy was $20,122.22.

It is agreed that from the inception of the accounts receivable arrangement in March, 1935, that as a matter of "practice" the bank required that the net amount of the accounts receivable and the balance in account number two at all times aggregate $25,000 before permitting any withdrawal by the company from account number two. It is pertinent to note that the agreement of May 3, 1935, contained no provision in that respect.

An analysis of the testimony and of the records of the dealings between the company and the bank discloses that during the four months before the bankruptcy, with the exception of but a few days, the balance of the assigned accounts and the cash account number two at all times approximated $25,000.

As previously stated, the facts above set forth are undisputed.

The procedure with respect to withdrawals by the company from account number two is the crux of the controversy between the trustee in bankruptcy and the bank. That, of course, raises a fact question as to which the referee adopted the contention of the trustee in bankruptcy, resulting in the petition for review.

I am of the opinion that the decision of Judge Kirkpatrick, of this District, in the case of In re Lambert & Braceland Co., D.C., 29 F.2d 758, is dispositive of the principal issue in this controversy. The parties differ sharply in their interpretation of Judge Kirkpatrick's decision, in addition to their dispute on the fact question, the procedure with respect to withdrawals. As a result of this situation I have before me then the fact question as well as the interpretation of Judge Kirkpatrick's opinion.

First, as to the fact question:

The testimony clearly and indisputably discloses that the bank did not permit any withdrawals by the company from account number two until *after* there had been deposited additional accounts receivable in an amount equal to, or in excess of, the amount permitted to be withdrawn. At times several days elapsed after the deposit of additional accounts receivable before withdrawals were permitted from account number two. The following excerpts from the notes of testimony of the referee's hearings give a clear picture of this situation:

Hearing of February 8, 1937, pp. 15, 16 (pp. 69, 70 of the referee's record), testimony of James D. Matthews, loan clerk, Philadelphia National Bank:

"By the referee:

"Q. Do you know the method which the bank adopted after taking this collateral note of March 18, 1935, with reference to protecting its interest, in addition to the papers themselves? A. Under this agreement, dated May 3d, we opened the Number Two account in our ledger. The checks drawing funds from that account were to be countersigned by Mr. McCullough, an officer or a clerk of the Loan Department, and an officer of Pusey-Maynes and the funds deposited in that Number Two Account consisted of their collections which were assigned to us.

"Q. You mean collections made by Pusey-Maynes? A. Yes.

"Q. *In other words, your bank let Pusey-Maynes make collections? A. That's right and they deposited those funds in the Number Two Account. At the end of the week, or Monday morning, they had built up certain funds in their Number Two Account. They would give us new accounts for material which had been sold the previous week, and we would allow them to draw a certain amount or corresponding amount of cash from that Number Two Account.*

"Q. *When did you allow them the cash? Not at the very instant you got the account? There was some lapse of time in many cases? A. That was up to them.*

"Q. *Was there a lapse of time? A. Some weeks. Certain weeks there would be a lapse of time of a day or two."*

Hearing of November 29, 1937, pp. 26, 27, 28 (pp. 390, 391, 392 of the referee's record), testimony of Mr. Matthews:

"By Mr. Granger:

"Q. Did you at any particular time in the week arrange to see that deposits were made coming from assigned accounts, say proceeds of collections of assigned accounts in the Number Two Account? Was there any set theory for doing that in any given week, say? A. I think they were supposed to do it, if convenient, daily.

"Q. Don't you remember testifying that at the end of the week or on Monday morning they built up certain funds in their Number Two Account? A. Yes.

"Q. Did they make any deposits? A. Monday was generally the transfer day, as I know this account.

"Q. I wanted to know what you mean by deposit? A. *They would have $5,000 or $10,000 cash on Monday representing the past week's collections and then, if they had bills to pay in their Number One Account or regular account, then they would bring in their assigned invoices for the previous period's business, maybe two or three days, and deposit these with us, and we would give them the difference as a transfer.*

"By Mr. Littleton: Q. You mean new assigned accounts? A. Yes.

"By Mr. Granger:

"Q. At any set time in the week they brought in new assigned accounts, or they would bring them in any day? A. We set no day.

"Q. Was any day set by them? A. I am going back a little far now, and I am not quite sure of my memory. I think Mr. Linville was the man who told me Monday was their best day to bring them in because it was at that time they tried to clear up their bills for the previous week.

"Q. I am not talking about what anyone told you. What they did. A. They did as they pleased. Sometimes they came in every day and made deposits of assigned accounts.

"Q. Isn't it true you testified and it was a fact· there was a lapse of some time between the bringing in of new accounts and the surrender of cash by the bank to Pusey-Maynes—withdrawal of cash? A. No, no lapse in the permission. It was up to them when they wanted it. *They could make a deposit of additional assigned accounts every day of the month and not ask for a transfer. It was not automatic. They had to ask for it. They could deposit Monday, Tuesday and Wednesday and probably let it ride until Friday and suddenly decide they needed something.*

"Q. *It wasn't done simultaneously?* A. *Not always.*"

It cannot be questioned that the deposit of additional accounts receivable always *preceded* the withdrawal of cash by the company from account number two; and that in this connection the bank almost universally required, in allowing withdrawals from account number two under the circumstances described, that there remain on hand an aggregate of accounts receivable and cash in the sum of approximately $25,000. There is no doubt, also, from the testimony, that there was no "simultaneous" deposit of additional accounts receivable with each withdrawal from account number two.

Hearing of April 6, 1937, pp. 10, 11 (pp. 204, 205 of the referee's record), testimony of Mr. Matthews:

"By Mr. Granger: Q. You mean by withdrawal, when Pusey-Maynes drew a check against Number Two Account for deposit in Number One Account you would recognize it if the balance in the Collateral Loan plus Number Two Account was at least $25,000?

"By Mr. Littleton: That wasn't what he said.

"Q. (Question repeated.) You mean by withdrawal, when Pusey-Maynes drew a check against the Number Two Account, for deposit in the Number One Account, you would recognize it if the balance in the Collateral Loan plus Number Two Account was $25,000 at least. That is a fact? A. No, it would have to be more than $25,000. No, we would not recognize the check if it was just $25,000. That is the amount they would have to carry there. *They could not withdraw unless they gave us more accounts to make it up. If they had an even $25,000 there—cash six, and nineteen of accounts, that would give us $25,000 and they could not withdraw anything. That would be taking our margin away. If the balance was $27,000 they would be entitled to a cash withdrawal of $2,000.*

"Q. *In other words, whenever a withdrawal was made from Number Two Account to Number One Account, the bank wanted to satisfy itself first that there was a sufficient amount in the Collateral Loan Account plus the Number Two Account, plus the amount of the withdrawal, to give the bank a net of $25,000 in the way of security?* A. That's right. There had been several times when we made exceptions to the rule, when they assured us they had bills of lading coming through for cattle, they would get the bills of lading and unload the merchandise, and then they assured us there was sufficient collateral on its way. We allowed that lee-way in a few ·cases.

"Q. That was done throughout the period, from time to time? A. Each case· was on its own merits. They had to apply to us and make arrangements for it."

As to returned merchandise. When merchandise was returned by customers, new accounts receivable were substituted for accounts previously assigned on which the merchandise had been returned.

The evidence discloses that in order to determine the amount of security held by the bank at any given time the bank relied on the total of account number two and the assigned accounts, and that the bank kept no record which would show at a glance the total of assigned accounts and account number two. The bank kept collateral loan cards disclosing the balances of accounts receivable held by the bank on particular dates, as well as the dates of each assignment and each deposit in Account Number Two.

Based on his finding of fact (p. 11 of referee's opinion; p. 473 of the record) that "The new assignments of accounts receivable made by Pusey-Maynes Breish Company to the bank during the four month period just prior to bankruptcy, were made not in exact, equivalent and simultaneous substitutions * * *" the referee ruled that such assignments "constituted a preference voidable in bankruptcy" and that "such assignments constituted additional security taken during the four month period prior to bankruptcy for a pre-existing debt and created a preference to the extent that they depleted the assets of the bankrupt."

It will be noted that the referee construed the law to be that substitutions of new accounts must be "exact, equivalent and simultaneous" with withdrawals of cash derived from liquidation of old collateral. It was this construction of the law which led the referee into his error.

■ The law does not require, as held by the referee, that the deposit of additional accounts receivable as collateral be "simultaneous" with the withdrawal or release of cash from liquidation of prior existing accounts receivable or collateral.

■ Under Judge Kirkpatrick's decision in the case of In re Lambert & Braceland Co., supra [29 F.2d 759], it is merely required that "the withdrawal must not take place before the delivery of the substituted security." Said Judge Kirkpatrick (29 F. 2d at page 759): "The law upon this point is clear. While a creditor holding collateral may, without losing his secured status, permit an indefinite number of substitutions of collateral of equal value not diminishing the debtor's estate, 'the two transactions—the withdrawal of the old security and the substitution of the new —must be contemporaneous; *at any rate the withdrawal must not take place before the delivery of the substituted security.* * * * Where new accounts are substituted for old accounts, withdrawn at the time, of course no preference results; but where old accounts held as security have been collected, new accounts thereafter delivered within the four months' period to replace those sold, will be preferences, if the other elements of preference also exist.' Remington on Bankruptcy, §§ 1708 and 1779."

The referee interpreted the word "contemporaneous"[1] to mean "simultaneous" and evidently predicated his ruling on that interpretation.

It may be noted at this point that in the Lambert & Braceland Co. case, Judge Kirkpatrick found against the assignee of the accounts receivable in applying the rule which he stated. The facts in that case differed from those in the instant case. In the Lambert & Braceland Co. case, the accounts receivable were assigned on the first of each month, and a list was then given to the assignee. The proceeds of the accounts were collected by the assignor and put into the assignor's *own* bank account, with the unrestricted right of the assignor to draw on the account. On the first of the following month a new list of accounts receivable was deposited with the assignee. Thus, in the Lambert & Braceland Co. case, the cash received in liquidation of the assigned accounts receivable was first used by the assignor and then *thereafter* the assignor assigned new accounts receivable in substitution of the liquidated assigned accounts. There was no dominion or control over the proceeds of the assigned accounts in the Lambert & Braceland Co. case by the assignee. In contrast, in the instant case, the proceeds

---

[1] "In *contemporary* and *contemporaneous* (of which *contemporary* is applied more frequently to persons, *contemporaneous* to events) the time regarding which agreement is implied is indefinite; Shakespeare's last year was also *contemporaneous* with Moliere's first. *Simultaneous* more frequently denotes agreement in the same point or instant of time; the two shots were *simultaneous.*" Webster's New International Dictionary.

of all of the assigned accounts were placed in a separate bank account, from which withdrawals could be made only upon counter-signature of the assignee bank *after* new collateral had been assigned.

Additionally, it must be noted that in the Lambert & Braceland Co. case "no entries were made upon the company's books setting aside the accounts assigned, except at the time of the last substitution." 29 F.2d at page 759, supra. In the instant case, under the May 3d loan agreement, as previously stated, it was required that the bankrupt should make suitable endorsement on its books, disclosing the assignments of the accounts to the bank, and it is undisputed that this provision was carried out.

The books of the company were examined by the representatives of the bank at least once a month, in order to verify that the assignments of the accounts receivable were properly noted in the company's ledger.

■ The record discloses that the assignee bank gave adequate consideration for the assigned accounts, as required by law, In re Monumental Shoe Mfg. Co., D. C., 14 F.2d 549; that the bank maintained control over the accounts and, in fact, allowed the bankrupt assignor no dominion whatever over the assigned accounts; and that the dominion and control by the assignee necessary to maintain a valid pledge of accounts receivable under the cases were fully exercised, see Greey v. Dockendorff, 231 U.S. 513, 34 S.Ct. 166, 58 L.Ed. 339; Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991; McCluer v. Heim-Overly Realty Co., 8 Cir., 71 F.2d 100; In re Hawley Down-Draft Furnace Co., 3 Cir., 238 F. 122; In re Monumental Shoe Mfg. Co., supra; In re Prudence Co. Inc., 2 Cir., 88 F.2d 420; and In re Vanity Fair Slippers, Inc., D.C., 4 F.Supp. 83.

■ It is well settled that: "The mere exchange of one kind of property or security for another of equal value, the renewal of a mortgage, or a pledge of property for a present consideration are not void as preferences, though done within four months of the filing of a bankruptcy petition, since one creditor is not favored or preferred over others and the bankrupt's estate is not diminished." In re Hunt, D. C., 18 F.Supp. 338, 339.

See, also, Sexton v. Kessler, 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995; Gorman v. Littlefield, 229 U.S. 19, 33 S.Ct. 690, 57 L.Ed. 1047; and Stewart v. Platt, 101 U.S. 731, 25 L.Ed. 816. The following quotation from Stewart v. Platt, supra, is particularly pertinent (101 U.S. at page 742, 25 L.Ed. 816): "This was, in its substance and effect, a mere exchange of securities, not forbidden by the letter or the spirit of the bankrupt law. In Cook v. Tullis (18 Wall. 332 [21 L.Ed. 933]), we said that 'a fair exchange of values may be made at any time, even if one of the parties to the transaction be insolvent. *There is nothing in the Bankrupt Act, either in its language or object, which prevents an insolvent from dealing with his property, selling it or exchanging it for other property at any time before proceedings in bankruptcy are taken by or against him, provided such dealing be conducted without any purpose to defraud or delay his creditors or give preference to any one, and does not impair the value of his estate.* An insolvent is not bound in the misfortune of his insolvency to abandon all dealing with his property; his creditors can only complain if he waste his estate or give preference in its disposition to one over another. *His dealing will stand if it leave his estate in as good plight and condition as previously.*' Substantially the same doctrine was announced in Clark v. Iselin, 21 Wall. 360 [22 L.Ed. 568]; Sawyer v. Turpin, 91 U.S. 114 [23 L.Ed. 235]." (Italics supplied.)

■ It is clear in the instant case that the deposit of new accounts receivable simply constituted a substitution of collateral security.

■ The law does not require that the substitution be exactly equal in amount to the fund withdrawn. See In re Bernard & Katz, Inc., 2 Cir., 38 F.2d 40, which held, in part: "The sum advanced by the lender is a present consideration for the assignment of accounts, whatever their value. Of course, the lender may take more security than just enough to cover the advance; for the surplus, if he realizes more than enough to satisfy the debt, he will have to account at the proper time." 38 F.2d at page 42.

It is necessary to discuss one other point.

The referee found that the company was insolvent during the four months prior to bankruptcy, and that the bank during said period "had reasonable cause to believe that the enforcement of assignment of ac-

counts receivable during the said four months' period under the circumstances would effect a preference."

The evidence sustains the finding of the referee as to this insolvency; it does not, however, sustain his finding that the bank had reasonable cause to believe that the assignments during that period would constitute a preference.

Section 60, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. b, defines "voidable preference". It reads as follows: "If a bankrupt shall have * * * made a transfer of any of his property, and if, at the time of the transfer * * * and being within four months before the filing of the petition in bankruptcy * * * the bankrupt be insolvent and the * * * transfer then operate as a preference, and the person receiving it * * * shall then have reasonable cause to believe that the * * * transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person."

■ It is well settled that only assignments within the four months' period which diminish the estate of the bankrupt are preferences, and that a pledge or assignment for a present consideration does not constitute a preference. See First National Bank v. Pennsylvania Trust Co., 3 Cir., 124 F. 968; Robertson v. Hennochsberg, D.C., 1 F.2d 604; Doggett v. Chelsea Trust Co., 1 Cir., 73 F.2d 614; Nolen v. Ware Trust Co., D.C., 10 F.Supp. 297; and Petition of Post, 1 Cir., 17 F.2d 555.

There is nothing in the record to sustain a conclusion that the bank had "reasonable cause" to believe that its transactions with the bankrupt during the four-month period would effect a preference. It is important, of course, to remember that the assignment of the accounts receivable was originally made to the bank considerably more than a year and a half prior to the bankruptcy. It is also important to remember that when the March 12, 1935, collateral note, which marked the inception of the arrangement between the bankrupt and the bank, was "put on" by the bank on March 18, 1935, that the amount of accounts receivable assigned as collateral at the time was in the sum of $21,995.25, compared to the proved indebtedness at the time of bankruptcy of $20,122.22.

There is not the slightest basis for any finding of insolvency in March, 1935 (when the collateral was assigned), or on May 3, 1935 (when the loan agreement was executed); in fact, there is no contention by the trustee in bankruptcy that there was any insolvency until approximately four months before the bankruptcy.

■ It is perfectly clear that the operation of the revolving fund, under the agreement of May 3, 1935, did not work any fraud on creditors or in any way result in any preference.

Accordingly, the petition of the Philadelphia National Bank is granted, and the order of the referee to turn over to the trustee in bankruptcy the assigned accounts and the proceeds thereof is reversed.[2]

---

[2] See In re De Luxe Oil Co., D.C., 36 F. Supp. 287, in which the same conclusion is reached.